**BANK LINE, Limited, v. UNITED STATES**
(two cases).

**THE SHIRRABANK.**

**THE P. C. 472, etc.**

**THE WINSUM.**
Docket No. 20681.

Circuit Court of Appeals, Second Circuit.
July 16, 1947.

John F. X. McGohey, U. S. Atty., of New York City (Edwin Longcope, Sp. Asst. to Atty. Gen., of counsel), for the United States.

Haight, Griffin, Deming & Gardner, of New York City (Charles S. Haight, John W. Griffin, and MacDonald Deming, all of New York City, of counsel), for libellant.

Burlingham, Veeder, Clark & Hupper, of New York City, for respondents Royal Netherlands Government et al.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The libellant, Bank Line, owner of the British Steamship Shirrabank, filed two libels, one against the United States as owner of naval escort vessel P.C. 472, P.C. 473, P.C. 475 and P.C. 481, and the other against the United States, as owner of the Lookout Mountain and the naval escort vessels, and also against the Dutch Government and the master of the Dutch Steamer Winsum. The libels were to recover damages to the Shirrabank arising out of a collision with the Steamer Lookout Mountain.

On February 9, 1944 the libellant's Steamship Shirrabank was proceeding in the channel leading into Casablanca, French Morocco, in an inbound convoy. The Lookout Mountain, a vessel owned and operated by the War Shipping Administration, was proceeding in the channel in a convoy outbound from Casablanca. Both convoys were escorted by United States and Allied War Craft. The channel was through adjacent minefields, was swept and marked by buoys, and was used by war vessels and by vessels carrying war materials to reach Casablanca. Within a short period of time there occurred in the channel in a fog some four collisions involving eight vessels—inbound vessels colliding with outbound vessels—of which series of collisions that between the Shirrabank and the Lookout Mountain was one.

One of the principal questions in the two suits is on which side of the channel the collision occurred. It seems to have been impossible, on account of the heavy fog, for the vessels to descry some of the

buoys or to see one another. Whether the respective vessels followed their naval guides, what were the courses of those naval guides, and what buoys they passed, are other questions to be resolved. The Shirrabank is said to have been following the Dutch Steamer Winsum, which in turn was presumably following a naval escort vessel. The libellant argues that in such a situation the truth about the collision will have to be ascertained by combining the observations of the different vessels in order to determine the courses with reference to the various buoys and to fix the place of collision. To achieve this, the libellant seeks to ascertain facts developed at an investigation had two or three days after the accident by a Naval Board consisting of three officers appointed by the Commander of the Moroccan Sea Frontier Forces. This Board of Investigation was convened pursuant to Navy Regulations providing as follows: "In the event of a collision between a vessel of the Navy and a merchant vessel, a Court of Inquiry or a Board of Investigation shall be ordered to determine the responsibility for the accident, the extent of the injuries received, the probable amount of damages and all attendant circumstances."

The libellant moved in the District Court for an order directing the United States (1) to answer various interrogatories of the libellant; (2) to produce for inspection and copying a certain chart showing the entrance into Casablanca Harbor, the location of the channel leading into the Harbor and the positions of the buoys in the channel; (3) to produce for inspection and copying a transcript of the hearing before the Naval Board relating to the collision.

The Navy objected to the granting of the motion on the ground that the investigation was held solely for naval purposes and because of a possible need for disciplinary action respecting the conduct of commanding officers of certain of the escort vessels attending upon the colliding vessels. Presence of civilian witnesses before the Board was purely voluntary, and a copy of the testimony of the master of the Shirrabank was furnished to the libellant. No witnesses from the Lookout Mountain testified, as that vessel had left the port of Casablanca prior to the hearing. The court made an order granting the motion as to the above items (1), (2) and (3), except such portions of the record before the Board as dealt solely with disciplinary action. Thereafter the United States moved for a reconsideration of the matter and a vacation of the order. It submitted in support of the application a written statement by the Judge Advocate of the Navy asserting that the record of the Board of Investigation was privileged and saying that after the Board had made a finding of fact the following action was taken by the Navy Department:

"Action will be taken in separate correspondence to prevent convoys passing in the approach channel, during thick weather, and to insure that incoming escort commanders maintain better control of their convoys."

The statement of the Judge Advocate of the Navy made further representations which are quoted in part in the margin.[1]

The libellant made an affidavit that it had vainly endeavored to obtain statements from the other vessels involved in the collision and that it is necessary in order to

[1] "The situation is of very considerable concern to the Navy Department. It presents the issue of whether its investigatory and fact-finding procedure, upon which possible deficiencies in the naval service may be reviewed and corrected, becomes a public record and available to any litigant who joins the United States in a proceeding. If the investigatory procedure has no privileged status, then the administration of the Navy Department will be seriously hampered. Further these proceedings often involve disciplinary matters and aspects beyond civil litigation become publicized to the detriment of individuals involved. In the particular instance the issue is whether a foreign shipowner is to have full access to the records of an investigation which was made into a war activity, the administration of the channel approach leading to Casablanca, as a result of which administrative changes in operation were effected.

"The Navy Department records indicate that there are approximately 100 cases pending in litigation where naval vessels are involved; there is no record

ascertain the facts to learn the identity of the witnesses, and that the record of the investigation at Casablanca is the only means by which it can secure the required evidence and properly prepare its case for trial. The District Court denied the motion for vacation of its former order.

After the foregoing decisions of the District Court the government filed a petition in this court for a writ of prohibition and/or mandamus prohibiting the judges of the District Court from taking steps to enforce the production of the record of the proceedings of the Board of Naval Inquiry and requiring them to vacate so much of the orders as directed the production of the record of the Board. This motion for the alternative writ is supplemented by a communication from the Acting Secretary of the Navy to the Attorney General in which the following appears:

"After full consideration of the opinion of the District Court and its effect upon Navy Department procedure, the Navy Department reiterates the considerations set forth in the Judge Advocate General's communication of 9 May 1946. The Navy Department is of the view that an inability to conduct an investigatory proceeding into its own administration, without the record becoming available to litigants, if the matter should become involved in litigation, will greatly hamper the effective functioning of the Navy Department and is prejudicial to its best interests. For that reason, the Navy Department considers the compulsory production of records of its investigations prejudicial to the Navy Department and, therefore, not in the public interest.

"Accordingly, the Navy Department urges the Department of Justice to take such further steps as may be practical in order to obtain a review of the District Court's opinion in this matter."

■■ It is conceded that the orders of the District Court directing the production of the record are not final and therefore not appealable. Such was the effect of the decision of the Supreme Court in Cobbledick v. United States, 309 U.S. 323, 60 S. Ct. 540, 84 L.Ed. 783, where an order denying a motion to quash a subpœna duces tecum requiring one to appear with papers and testify before the grand jury was held not final and consequently not appealable. We can see no difference in respect to finality between an order directing a party to produce a record for examination and a subpœna duces tecum. The present petition for an alternative writ of prohibition and mandamus as a mere short cut for an appeal clearly does not lie as the Supreme Court held no later than June 23, 1947 in Ex parte Fahey, 67 S.Ct. 1558. This is not a case where intervention is sought to protect the immunity of a foreign power or of one of the states as in Ex parte Republic of Peru, 318 U.S. 578, 587, 63 S.Ct. 793, 87 L.Ed. 1014, and Ex parte State of New York, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057. Nor is it necessary to save the delay and expense of a separate trial as in Ex parte Simons, 247 U.S. 231, 38 S.Ct. 497, 62 L.Ed. 1094; Ex parte Peterson, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 and Bereslavsky v. Caffey, District Judge, 2 Cir., 161 F.2d 499, filed May 7, 1947. We have no doubt that we have jurisdiction to issue an alternative writ in a proper case but these writs, as Justice Jackson said in Ex parte Fahey, supra, "should be resorted to only where appeal is a clearly inadequate remedy. * * * As extraordinary remedies, they are reserved for really extraordinary causes." [67 S.Ct. 1559.]

■■ The present cases are not "extraordinary causes" but are ordinary libels to recover collision damages. The libellant has stated in its brief that it does not now ask for the production of findings or opinions of the Board of Inquiry, but only for answers to the interrogatories propounded, the competency of which the United States does not dispute and the details of which the latter claims to have already furnished orally; for the chart of Casablanca Harbor, which the Navy Department has supplied, and for testimony (so far as not al-

of the number of investigations held in situations where there may now be litigation pending between the vessels involved and, where under the ruling in the instant case, application could be made for the compulsory production of the Navy record."

ready supplied) of the witnesses taken before the Board of Inquiry—testimony which would have to be furnished by the government if it were a private litigant. The libellant has moved for the production of the record pursuant to Supreme Court Admiralty Rule 32, 28 U.S.C.A. following section 723,[2] This rule was copied from Rule 34 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, which has been construed as giving broad scope to inquiries to aid in the preparation for trial and embraces situations where the documents sought "contain evidence material to any matter involved in the action." The right of discovery under this rule is not restricted to documents which are competent as evidence, if they contain facts which may be the source of information that would be admissible at the trial. Hickman v. Taylor, 3 Cir., 153 F.2d 212, 218, affirmed 329 U.S. 495, 67 S.Ct. 385. The question, therefore, is whether a writ of prohibition or mandamus will lie merely because the Navy Department objects to producing testimony contained in the record of the Board of Inquiry on the ground that such testimony is privileged and disclosure is against the public interest. We are referred to no decisions of the Supreme Court which have permitted writs of prohibition or mandamus on the ground which alone can be here urged that to order a high officer of state to refuse compliance with an order to disclose might subject him to the embarrassment of a compulsory order. In spite of the speed and convenience of testing the privilege asserted by an application for prohibition or mandamus we think these advantages are answered (1) by the extreme disinclination of the Supreme Court to allow such writs as a substitute for an appeal, (2) by the right of an appeal from a contempt order, if one should issue to effectuate the orders of the District Court already made, and (3) by the uncertainty whether a contempt order would issue in view of the power of the judge to apply some of the other sanctions provided by Admiralty Rule 32C (b).[3]

---

[2] "Rule 32. Discovery and Production of Documents and Things for Inspection, Copying, or Photographing.

"Upon motion of any party showing good cause therefor and upon notice to all other parties, the court in which an action is pending may (1) order any party to produce and permit the inspection and copying or photographing, by or on behalf of the moving party, of any designated documents, papers, books, accounts, letters, photographs, objects, or tangible things, not privileged, which constitute or contain evidence material to any matter involved in the action and which are in his possession, custody, or control; or (2) order any party to permit entry upon designated land or other property in his possession or control for the purpose of inspecting, measuring, surveying, or photographing the property or any designated relevant object or operation thereon. The order shall specify the time, place, and manner of making the inspection and taking the copies and photographs and may prescribe such terms and conditions as are just."

[3] "Rule 32C

"(b) Failure to Comply With Order.

"(1) Contempt. If a party or other witness refuses to be sworn or refuses to answer any question after being directed to do so by the court in the district in which the deposition is being taken, the refusal may be considered a contempt of that court.

"(2) Other Consequences. If any party or an officer or managing agent of a party refuses to obey an order made under subdivision (a) of this rule requiring him to answer designated questions, or an order made under Rule 32 to produce any document or other thing for inspection, copying, or photographing or to permit it to be done, or to permit entry upon land or other property, or an order made under Rule 32A requiring him to submit to a physical or mental examination, the court may make such orders in regard to the refusal as are just, and among others the following:

"(i) An order that the matters regarding which the questions were asked, or the character or description of the thing or land, or the contents of the paper, or the physical or mental condition of the party, or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

"(ii) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing in evidence designated documents or things or items of testimony, or from introducing evidence of physical or mental condition;

"(iii) An order striking out pleadings

It has been the policy of the American as well as of the English courts to treat the government when appearing as a litigant like any private individual. Any other practice would strike at the personal responsibility of governmental agencies which is at the base of our institutions. The existence of governmental privileges must be established by the party invoking them and the right of government officers to prevent disclosure of state secrets must be asserted in the same way procedurally as that of a private individual, without recourse to prerogative writs where such writs would not be available to the ordinary citizen. In Hickman v. Taylor, 3 Cir., 153 F.2d 212, affirmed 329 U.S. 495, 67 S.Ct. 385, the court reversed an order which held a party in contempt for refusal to produce certain pretrial memoranda on the ground that the direction on which the contempt order was based was not authorized by the rules.

In determining in a case like the present the propriety of a contempt order or of the application of any of the other sanctions of Admiralty Rule 32C (b), it is to be noted that 5 U.S.C.A. § 22 has provided that: "The head of each department is authorized to prescribe regulations, not inconsistent with law, for the government of his department, the conduct of its officers and clerks, the distribution and performance of its business, and the custody, use, and preservation of the records, papers, and property appertaining to it. (R.S. § 161.)" In Boske v. Comingore, 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846, the Supreme Court held that it was competent for the Secretary of the Treasury under the above section to forbid his subordinates to allow the use of official papers except for the purpose of aiding in the collection of the revenues of the United States. On January 9, 1905, Attorney General Moody rendered an opinion to the Secretary of Commerce and Labor as to the grounds upon which the Secretary might decline to furnish official records of the department, or copies thereof, or refuse to give testimony in a cause pending in court. He expressed the opinion that the Secretary might "properly decline to furnish official records of the Department, or copies thereof, or to give testimony in a cause pending in court, whenever in your judgment the production of such papers or the giving of such testimony might prove prejudicial for any reason to the Government or to the public interest." 25 Op.Atty.Gen. 326, 331. As authority for this position he cited Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60; Boske v. Comingore, 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846, and two earlier opinions of Attorney General Devens and R.S. § 161, in addition to R.S. § 176, 5 U.S.C.A. § 44, authorizing the Court of Claims to call upon governmental departments for any information deemed necessary provided that "the head of any Department may refuse and omit to comply with any call for information or papers when, in his opinion, such compliance would be injurious to the public interest." The Navy Department Regulation, 34 Code of Fed.Regs. § 12.15 (applicable to the production of documents), is cited in the margin.[4]

The above statutes, decisions, regulations

or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

"(iv) In lieu of any of the foregoing orders or in addition thereto, an order directing the arrest of any party or agent of a party for disobeying any of such orders * * *."

[4] 12.15 Production of documents in civil court in response to a subpena duces tecum. Unless authorized by the Secretary of the Navy, persons in the naval service and civil employees are prohibited from producing official records or copies thereof in a civil court in answer to subpenas duces tecum, or otherwise, and from disclosing the information described in article 113, Navy Regulations, or the secret and confidential correspondence and information described in article 2005, Navy Regulations. In all cases where copies of records are desired by or on behalf of parties to a suit, whether in a Federal or State court, such parties will be informed that it has been the invariable practice of the Navy Department to decline to furnish in the case of legal controversies, at the request of the parties litigant, copies of papers or other information to be used in the course of the proceedings, or to grant permission to such parties or their attorneys to make

and opinions are referred to not to express our opinion on the merits as we have before us only the propriety of issuing a writ of prohibition or mandamus, but for consideration of the District Court in connection with any application which may be made for enforcement of its orders to produce the record of the testimony taken before the Board of Inquiry. In the event of such an application that court may also desire to consider the views of the English House of Lords recently expressed by Lord Chancellor Simon in Duncan v. Cammell, Laird & Co., [1942] A.C. 624, when discussing the nature of the privilege to withhold production of official documents on grounds of public interest. It was there said that upon objection by the Crown to the production of such documents the ruling to be made involved a "decision of the judge." The opinion set forth the kind of objections that would furnish good ground for refusal to produce the documents and added: "When these conditions are satisfied and the minister feels it his duty to deny access to material which would otherwise be available, there is no question but that the public interest must be preferred to any private consideration." [1942] A.C. 624, 642-3.

Here we are not passing on the merits of the orders by the District Court which the government seeks to attack but merely suggesting considerations for the District Court in the event further steps to enforce its orders are taken. Our decision is limited to holding that a writ of prohibition or of mandamus should not be granted. Accordingly the petition is denied.

CLARK, Circuit Judge (concurring).

I concur, but desire to add two further suggestions. First, I think Ex parte Fahey, 67 S.Ct. 1558, condemns the approach of Bereslavsky v. Caffey, 2 Cir., 161 F.2d 499, and is not to be distinguished from it; at any rate I think it desirable to express my own disagreement with the views expressed in the latter case, both in the decision itself and in the dictum expressing nostalgia for the old separation of law and equity. Second, I think we should avoid any implication of a suggestion that the Navy has, as yet, shown fully adequate grounds for refusing discovery. Certainly for the conduct of war and for purposes of national defense the proper heads of our armed forces may make a decision of the need of concealment, which the courts must respect; but I think no general principle of refusing discovery on a general statement of prejudice to its best interests can or should be applied to any branch of the government, including the armed forces.[1] Here we are dealing with matters of a war now closed, i. e., with matters of history; could the Navy refuse information in its files as to the development of the Monitor on a present claim of privilege? We are not at war now, and I do not believe it will aid and comfort some unknown potential enemy if the Navy now states why concealment of specific information is material to national defense. The English experience seems not wholly untroubled; compare the earlier case of Robinson v. State of South Australia [1931] A.C. 704, and the discussions in 56 Harv.L.Rev. 806; 58 L.Q.Rev. 1, 31, 232, 243, 436, 462; 59 Id. 7, 102; 20 Can.B.Rev. 805; 21 Id. 51; 8 Camb.L.J. 328; 58 Scot.L.Rev. 102; 60 Id. 1, with extensive reliance upon the classic limitations on executive power stated by Wigmore, 8 Evidence, 3d Ed. 1940, §§ 2378a, 2379. Now that the war is over, these scholarly discussions and frequent criticism of some of the grounds taken in the Duncan case, supra [1942] A.C. 624 (though not of the decision, which clearly involved war secrets), may lead to a reexamination of the important issue.

---

preliminary or informal examination of the records, but that the department will promptly furnish copies of papers or records in such cases upon call of the court before which the litigation is pending. In all cases where the production of records in civil courts is authorized, the original records are not to leave the custody of the person producing them. However, copies of such records may be introduced into evidence.

[1] Compare learned discussions from somewhat differing points of view in Pike and Fischer, Discovery Against Federal Administrative Agencies, 56 Harv.L.Rev. 1125, 1129–1132, and O'Reilly, Discovery Against the United States: A New Aspect of Sovereign Immunity? 21 N.C.L.Rev. 1.