**PACIFIC–ATLANTIC S. S. CO. et al. v.
UNITED STATES.
THE OREGON.**

No. 5827.

United States Court of Appeals
Fourth Circuit.

Argued April 5, 1949.

Decided June 9, 1949.

Robert S. Erskine, New York City (Baird, White & Lanning, Norfolk, Va., Kirlin,

Campbell, Hickox & Keating, New York City, George M. Lanning, Norfolk, Va. and Eugene F. Gilligan, New York City, on the brief), for appellant Pacific-Atlantic Steamship Co.

Leonard J. Matteson, New York City (Vandeventer & Black, Norfolk, Va., Bigham, Englar, Jones & Houston, New York City, and Barron F. Black, Norfolk, Va., and Julian S. Gravely, Jr., New York City, on the brief), for appellant E. J. Lavino & Co.

Alfred T. Cluff, Sp. Asst. to the Atty. Gen. (H. G. Morison, Asst. Atty. Gen., on the brief), for appellee.

Before PARKER, SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

The Pacific-Atlantic Steamship Company, as owner of the American motorship Oregon filed under the Public Vessels Act, 46 U.S.C.A. §§ 781–799, in the United States District Court for the Eastern District of Virginia, a libel in admiralty against the United States, in connection with the sinking of the Oregon after a collision between that vessel and the New Mexico, a battleship of the United States Navy. Intervening libels were filed by E. J. Lavino and Company and by Defense Supplies Corporation, owners of the Oregon's cargo. The United States filed a cross-libel for the damage to the New Mexico. The intervening libel of Defense Supplies Corporation was withdrawn before trial.

The District Court adjudged that, the collision "was caused entirely by faults and errors in navigation on the part of the Oregon," and decreed that the Pacific-Atlantic Steamship Company, as owner of the Oregon, is "entitled to limitation of its liability to the value of its interest in the Oregon and its pending freight." Further, it was ordered by the District Court that the intervening libelants are not entitled to any recovery from the Pacific-Atlantic Steamship Company, that there could be no recovery by any party against the United States, and that the United States recover its damages by reason of the collision from the Pacific-Atlantic Steamship Company, sub-

ject to this Company's right to limitation of liability. An appeal has been taken to us by the libelant, Pacific-Atlantic Steamship Company, and by the intervening libelant, E. J. Lavino and Company.

The collision between the Oregon and the New Mexico occurred about 4:42 A.M. on December 10, 1941, in the Atlantic Ocean at a point approximately forty miles south of the Nantucket Shoals Lightship. The New Mexico was preceded by a screen of three destroyers, the Hughes, the Sims and the Russell. The three destroyers were on the arc of a circle, each about 2,000 yards distant from the New Mexico, with the Hughes almost dead ahead of the New Mexico, the Sims on the New Mexico's port bow, about 20 degrees forward of the battleship's port beam, and the Russell on the New Mexico's starboard bow, about 20 degrees forward of the battleship's starboard beam.

Due to war conditions, all of the vessels here concerned were blacked out, running without lights. The four naval vessels, according to plan, were zigzagging. Their base course was 236 degrees true (about southwest by west); but, just before the collision, on a leg of the zigzag, they were on a course 216 degrees true, proceeding at a speed of 14 knots. The course of the Oregon was 340 degrees true (about north-northwest) and her speed was just over 13½ knots.

At the time of the collision, the sky was overcast; the moon was obscured by broken clouds of moderate density, with some diffusion of light through the clouds, and there was neither rain nor fog. The visibility was described by some witnesses as "good," by others as "fair." Captain Gillette of the Oregon, placed the range of visibility at from 1½ miles to 2 miles for such an unlighted object as a ship. According to the witnesses on the New Mexico, it was placed for the naked eye at 2 miles, with binoculars at from 2½ or 3 miles to 4 miles.

When the Oregon entered the arc of the destroyer screen, she was between the Hughes and the Sims, with the Hughes to the Oregon's port and the Sims to the Oregon's starboard. At this time, the Hughes was closer to the Oregon than the Sims, and the Russell was, of course, the most distant of the three destroyers.

As is quite usual in cases of this kind, there are grave discrepancies in the testimony of the various witnesses as to precisely what happened, and when and where and why, just before the collision. The elaborate and able opinion filed by the District Judge contains a searching analysis of the vital parts of the testimony, with extended findings of fact and conclusions of law appropriately based on these findings.

First, we review briefly the testimony given by the witnesses on the Oregon. Captain Gillette testified that he, the second officer and a lookout were on the starboard side of the bridge, keeping an alert watch, while able seaman Jackson was at the wheel. They observed a dark object (which was, of course, the New Mexico) bearing about 4 points on the starboard bow and about a mile or less distant. Immediately the running lights of the Oregon were turned on in pursuance of Captain Gillette's order, and, about 15 or 20 seconds later, the New Mexico turned on her running lights. According to Captain Gillette, he could not determine the course of the New Mexico until her lights came on and, accordingly, he could not until then perceive that the two ships were on intersecting courses.

Captain Gillette estimated the distance between the Oregon and the New Mexico, when the latter's lights came on, to be about one-third of a mile. He immediately ordered the helm "left" and a second or so later "hard left," in the belief that such conduct offered the best chance of avoiding an imminent collision, and he hoped the New Mexico would cooperate by turning to her right. He admitted that he gave no signal whatever to indicate his intention to make this turn, and that he made no effort to reduce his speed until the moment of impact, when he ordered full astern for the Oregon's engines. He stated that the collision occurred about one minute, or less, after he gave the "left" order.

At the time of the collision, according to Captain Gillette, the Oregon had turned about 40 degrees and was approximately a

ship's length to the left of her original course; while the New Mexico, which just a few seconds before had veered to her right, had swung about 10 degrees. This resulted in the New Mexico's bow striking the starboard side of the Oregon, forward of her bridge, at an angle of about 45 degrees. He fixed the time of the collision at 4:43 A.M.; and estimated the elapsed time between the first sighting by the Oregon of the dark loom of the New Mexico and the collision at about 1½ minutes.

The evidence indicates that no one on the Oregon saw any of the destroyers until the Oregon started her left turn just before the collision. Then the lights on the Hughes were seen.

The second mate of the Oregon and the seaman, who were on the Oregon's bridge with Captain Gillette, could not testify, as they were both drowned when the Oregon sank. The testimony of Jackson, who was at the wheel of the Oregon, followed, with some variations, the same general line as the evidence of Captain Gillette. His estimate of the elapsed time between the first sighting of the loom of the New Mexico by the Oregon and the collision was "not much over a minute," and the time interval between the start of the Oregon's turn to the left and the collision as "not more than half a minute." Jackson admitted his inability to make any accurate estimate of the distance at any time between the Oregon and the New Mexico, beyond his statement that, when the New Mexico first showed her lights, the two vessels were then "very close."

Next we comment upon the evidence on behalf of the New Mexico given by those on that vessel and those on the destroyers. Lieutenant (jg) Waliszewski was the New Mexico's officer of the deck. Through his binoculars he picked up the loom of a vessel (which was the Oregon) bearing about 45 degrees off the port bow of the New Mexico at a distance which he estimated to be between 5,000 and 6,000 yards, and he testified that this vessel appeared to be at least 2,000 yards ahead of and beyond the Sims. He called the strange vessel to the attention of Lieutenant Krick, super-visor of the watch on the New Mexico. While Waliszewski and Krick were discussing the strange vessel, the lights of the Oregon came on.

Thereupon, Krick ordered the lights of the New Mexico turned on and directed that Captain Brown, asleep in his sea cabin just a few steps away, be called. There was testimony by the officers concerned as to the following intervals of time: from Waliszewski's sighting of the loom of the Oregon until the latter showed her lights, 2 or 3 minutes; from the lighting of the Oregon until the lighting of the New Mexico, less than 20 seconds; from the time Waliszewski started for Captain Brown until the Captain appeared on the bridge, 20 or 30 seconds.

Krick estimated the distance between the New Mexico and the Oregon, at the time the latter's lights came on, as about 3,000 yards. Captain Brown, when he first saw the Oregon with his naked eye, estimated her distance at from 2,000 to 2,500 yards, and that when he procured his binoculars and observed the Oregon, she was about 2,000 yards away. There was further testimony by Captain Brown that, without changing the New Mexico's course or speed, he kept the Oregon under close observation for 3 or 4 minutes and that the Oregon, during that period, made no change in course or speed.

Captain Brown testified that when the distance between the two vessels was about 700 yards, he realized "that the Oregon could not avoid a collision by her own efforts," so he gave the order: "Right full, full speed astern," hoping that by swinging the New Mexico to the right and slackening her advance, a collision might be avoided. A blast was blown on the New Mexico's siren and a general alarm was sounded. The time between Captain Brown's order and the collision was estimated at a minute or slightly more.

Witnesses on the New Mexico testified that after the New Mexico had begun her swing to the right, and just before the collision, the Oregon began her swing to her left; that the New Mexico had swung about 350 yards to the right of her original

course; that the collision occurred at 4:42 A.M.; that the New Mexico's bow struck the starboard side of the Oregon at an angle of from 20 to 30 degrees; that from the moment the course of the Oregon could be ascertained by those on the New Mexico, the two ships seemed to be on probable collision courses. One signalman on the New Mexico ventured an estimate of the distance between the New Mexico and the Oregon, when the lights of the latter came on, at 1,500 yards.

Testimony was given by officers on all three of the destroyers. Lieutenant Farley, officer of the watch on the Sims, stated that at about 4:35 A.M. he was notified by the port lookout that an unlighted vessel (the Oregon) had been sighted at approximately 355 degrees relative bearing. The then distance of the Oregon from the Sims was estimated at about 4,000 yards. The presence of this strange vessel was reported to the division commander of the destroyers, who was on the Hughes, and the signalman on the Sims was ordered, by means of the blinker tube, to challenge the strange vessel. The Oregon continued her course with no acknowledgment of, or response to, this signal. When the lights appeared on the Oregon, she was estimated to be about 1,500 yards distant from the Sims. Lieutenant Farley could not, with any fair degree of accuracy, fix the time interval between the many occurrences just prior to the collision but contented himself with the estimate of "within 10 minutes or less" between the first sighting of the Oregon and the sounding of the siren on the New Mexico.

Evidence was given by Captain Ramsey and signalman Dickinson of the Hughes. The former testified that when he first saw the lights of the Oregon, she was about 2,200 yards from the New Mexico, and that, when the lights appeared on the New Mexico, the distance between the two vessels had been lessened to about 2,000 yards. Dickinson stated that he continuously challenged the Oregon with the blinker tube for one or two minutes, without receiving any response. His estimate of the distance between the Hughes and the Oregon when the two vessels passed each other was 1,500 yards and he stated that the Hughes was then on her station 2,000 yards from the New Mexico.

Lieutenant Hart, officer of the deck on the Russell, added little testimony that was important. When he was informed by the Sims of the sighting of the Oregon, he located the Oregon through his binoculars, and the Oregon, then unlighted, appeared to be bearing slightly more than 45 degrees off the port bow, and to be beyond the destroyer screen.

It would unduly prolong this opinion if an attempt were made to analyze the testimony of many other witnesses who gave evidence in this tragedy of the sea. Libelants stress the expert testimony given by Admiral Ainsworth and attempt to make much of the discrepancies, variations and even contradictions shown in the entries in the log books of the New Mexico and the destroyers. As the District Judge pointed out, these might well "be attributable to the conditions under which the entries were made * * *. They were all made after the happenings and represent the different writers' recollection of the time and sequence of the various events. Under such conditions, it is to be expected that differences in estimates of time intervals would appear in the different logs."

Counsel for libelants lay great stress on the failure of the United States to call as witnesses certain specifically named persons: Lieutenant Gentry and quartermaster's striker Hoover of the New Mexico and Lieutenant Moyer of the Hughes. The District Court, recognizing the general principle that "when a litigant fails to offer witnesses who are available a court may draw the inference that their testimony would not be helpful," went on to hold: "But when there are a dozen witnesses to an event and two of them are not called to testify, I know of no authority which compels a court to discredit entirely the testimony of the other ten." We must sustain that ruling under the circumstances of this case.

We think, too, the District Court did not err in denying the motion of appel-

lants to require the production of the record of the trial before a Navy Court after the collision. The courts have often dealt with the privileged status of such records. And here the United States cooperated rather handsomely in enabling libelants to present their side of this case. The searching interrogations of libelants were all answered; the logs, ships' records and voyage reports were produced, with the Navy's permission sought and obtained. The United States disclosed the testimony before the Navy Court of each witness who was called. And there is even evidence, in the record that counsel for the Oregon expressed satisfaction with this arrangement.

Ample authority for this action of the District Court is found in the cases. See, The Wright and the Papoose, D.C.E.D.N.Y., 2 F.Supp. 43; The Australian Star, D.C. S.D.N.Y.1946, A.M.C. 542; Maryland ex rel. Kent v. United States, (D.Md.) 1947 A.M.C. 1338; Anglo-Saxon Petroleum Co. v. United States, D.C., 78 F.Supp. 62. Cf. Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451; Admiralty Rule 32, 28 U.S.C.A.; 46 U.S.C.A. § 795; Newell v. Phillips Petroleum Co., 10 Cir., 144 F.2d 338, 340; Bank Line, Limited v. United States, 163 F.2d 133, on remand, 76 F.Supp. 801.

This brings us to the heart of the case: the District Court's findings of fact and conclusions of law, which absolved the New Mexico and the three destroyers of negligence contributing to the collision and placed the blame and fault solely on the Oregon. Conclusion of law No. 1 held applicable the Starboard Hand Rule of the International Rules of Navigation; Conclusion No. 2 negatived the existence of any emergency or special circumstances (under Article 27, 33 U.S.C.A. § 112) which either rendered these rules inapplicable or justified a departure from them; Conclusion No. 3 imposed upon the Oregon, as the burdened vessel, the duty to keep out of the way of the New Mexico; while Conclusion No. 4 emphasized the duty of the New Mexico, the privileged vessel, "to maintain her course and speed until such time as it became apparent to her that a collision could not be averted by the action of the Oregon alone."

Vital Conclusion of Law No. 5 reads:

"5. The Oregon was in fault in the following respects, which were the direct and proximate, and sole causes of the collision:

(a) She failed to keep a proper lookout.

(b) She failed to take proper precautions when she first sighted the New Mexico on her starboard side.

(c) After the ships were lighted and it was disclosed that they were crossing courses, she continued her course and speed and failed to make any effort to keep out of the way of the New Mexico and to avoid crossing ahead while there was adequate time to have taken avoiding action.

(d) When turning to her left immediately before the collision, she failed to give any warning of her change of course."

■ There is ample evidence to support the finding [(a) above] that the Oregon failed to keep a proper lookout. This is inescapable if we accept (as the District Judge did not) the testimony of those on the Oregon with respect to the distance at which the New Mexico was first sighted. Even, however, if this evidence be disregarded, and if the Oregon and the New Mexico were much further apart when the Oregon first sighted the loom of the New Mexico, the evidence here points clearly to a lack of care on the part of the lookouts of the Oregon. By Captain Gillette's admission, the range of visibility for an unlighted vessel was between one and one-half miles and two miles; other witnesses indicated an even longer range.

Though the New Mexico was larger than the Oregon, with the loom of the battleship more easily visible, the New Mexico sighted the Oregon an appreciable length of time before the Oregon saw the battleship. The New Mexico, the Sims and the Hughes sighted the Oregon at distances of from 3,000 to 5,000 yards. Although the Oregon passed into the screen between the destroyers Sims and Hughes at a distance necessarily not more than 1,300 yards from one of them (the evidence indicates that she

passed closer than this to the Hughes), no one on the Oregon saw any of the destroyers until the Oregon started her left turn immediately before the collision. Witnesses on behalf of the Oregon, moreover, stated that she never saw the signals directed at her by blinker tube from the destroyer.

Probably the most important question in this case, and the one most strongly emphasized by counsel, is whether or not, under the circumstances here existing, the Starboard Hand Rule is applicable. "The International Rules for Navigation at Sea" provide:

Article 19, 33 U.S.C.A. § 104. "When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

Article 21, 33 U.S.C.A. § 106. "Where, by any of these rules, one of two vessels is to keep out of the way the other shall keep her course and speed.

"NOTE.—When, in consequence of thick weather or other causes, such vessel finds herself so close that collision can not be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision."

Article 22, 33 U.S.C.A. § 107. "Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

Article 23, 33 U.S.C.A. § 108. "Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

Article 27, 33 U.S.C.A. § 112. "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

Article 29, 33 U.S.C.A. § 121. "Nothing in these rules shall exonerate any vessel, or the owner or master of crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

█ The New Mexico contends that the Starboard Hand Rule applies, which would make her the privileged vessel (and the District Court so held); while the Oregon insists that here was a case of sudden circumstances or emergency falling under the Note, above set out. If the Starboard Hand Rule does control, it is, of course, quite clear that the New Mexico was the privileged vessel and the Oregon the burdened vessel.

In this connection, very important are the District Court's Findings Of Fact Nos. 4, 5 and 6:

"4. The Oregon sighted the loom of the New Mexico when about one mile or a little more distant from the latter. On sighting the New Mexico the Oregon immediately turned on her lights and within 20 seconds thereafter the New Mexico became lighted. Both vessels became lighted when they were from 1500 to 2200 yards apart.

5. When both vessels became lighted it was apparent, or should have been apparent, to each of them that they were on crossing and probably collision courses. At all times the Oregon's bearing from the New Mexico was well on the latter's port bow and the New Mexico was bearing well on the Oregon's starboard bow.

6. When both vessels had become lighted and it was apparent to both that they were on crossing courses, the Oregon had adequate time to avoid crossing ahead of the New Mexico by stopping or slackening her speed or by turning to her right. However, the Oregon, from the time of sighting the New Mexico and thereafter, continued her course and speed until approximately a minute before the collision when she turned to her left across the course of the New Mexico in an attempt to avoid collision. The Oregon at no time prior to the collision slackened her speed nor did she give any signal of her intentions or plan of conduct." There is ample evidence in the record to

sustain these findings, which we cannot hold to be clearly erroneous, and they furnish adequate basis for the District Court's Conclusions of Law No. 5, (b), (c) and (d) set out above.

We think that the failure of the Oregon, under the Starboard Hand Rule, to take, as the burdened vessel, prompt and proper avoiding action (when there was time and opportunity for this) was the primary cause of the collision.

■ The Oregon, too, was (as the District Judge held) at fault when, immediately before the collision, she failed to give a warning signal of her course change to port. According to the captain of the Oregon, this desperate manoeuver was undertaken in the hope that the New Mexico might cooperate by turning to her (New Mexico's) starboard; but the New Mexico's captain could undertake no intelligent cooperation here so long as he was ignorant of what the Oregon would do.

■ The New Mexico was not at fault in holding her course and speed; for this was her duty under the Starboard Hand Rule. Many cases have set out the imperative nature of this duty and the importance of its observation by the privileged vessel. Thus, in The Norfolk, D.C., 297 F. 251, 255, modified on other grounds, Phillips v. Clyde S. S. Co., 4 Cir., 17 F.2d 250, District Judge (now Circuit Judge) Soper succinctly said: "This duty is as definite and precise as the duty of the burdened vessel to keep out of the way." And District Judge Watkins, speaking for our Court in The Piankatank, 4 Cir., 87 F.2d 806, 810, crisply stated:

"Where two courses are open to a vessel, and particularly to the privileged vessel, one to follow the prescribed rules and the other to depart from them, the duty is imperative to observe the rules, and to assume that an approaching vessel will do likewise, until after the danger has become so manifest as to show that there is no proper choice of judgment other than that of departing from the rules. Any other course would lead to confusion and be a most prolific source of accidents. Indeed the rule is so imperative that it does not give a navigating officer any general latitude as

to obeying the rules, and permits a departure only when necessary to avoid immediate, and not remote or problematical, danger, and then only to the extent required to accomplish that object."

In Belden v. Chase, 150 U.S. 674, 699, 14 S.Ct. 264, 272, 37 L.Ed. 1218, it was said:

"Obedience to the rules is not a fault, even if a different course would have prevented the collision; and the necessity must be clear, and the emergency sudden and alarming before the act of disobedience can be excused. Masters are bound to obey the rules, and entitled to rely on the assumption that they will be obeyed, and should not be encouraged to treat the exceptions as subjects of solicitude, rather than the rules."

To the same effect, see Marsden, Collisions at Sea, a standard English authority, 7th Ed., page 344; Farwell, The Rules of the Nautical Road, 2nd. Ed. 1944, page 214; Laboyteaux, The Rules of the Road at Sea, 170. And see, also, The Albert Dumois, 177 U.S. 240, 249, 20 S.Ct. 595, 44 L.Ed. 751; The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943; Matson Navigation Co. v. Pope & Talbot, Inc., 9 Cir., 149 F.2d 295, certiorari denied 326 U.S. 737, 66 S.Ct. 46, 90 L.Ed. 439; The Fred B. Dalzell, Jr., 2 Cir., 45 F.2d 580, 581; The Manaway, D.C., 257 F. 476, 477; Yang-Tsze Insurance Association v. Furness Withy & Co., 2 Cir., 215 F. 859, certiorari dimissed 242 U.S. 430, 37 S.Ct. 141, 61 L.Ed. 409.

■ There is no merit in the contention that merely because, at some time prior to the collision, the vessels were all blacked out the Starboard Hand Rule does not apply. See, The Jarrix, 1 Lloyd's List L.R. 93, 95; The F. J. Wolfe, 79 Lloyd's List L.R. 111. When the lights of the Oregon and the New Mexico came on, and the courses of the two vessels were thus ascertainable, the Oregon should have realized the situation as one governed by the Starboard Hand Rule and, as the burdened vessel, when there was ample time and opportunity, should have promptly taken proper avoiding action. There was then time for seamanly appraisal of the situation and seamanly action by the Oregon in the

light thereof, which would have prevented the collision. As was said in Cuba Distilling Co. **v.** Grace Line, Inc., 2 Cir., 143 F.2d 499:

"But no emergency will excuse the absence of all clear thinking; after all, men, charged with responsibilities of command, must not be wholly incapacitated for sound judgment when suddenly thrust into peril. Part of their equipment for their duties is some ability to think, be the situation ever so sudden and so grave."

There are cases suggesting that the Starboard Hand Rule is not to be strictly applied in blackout conditions but that this rule is grounded in what might be called the normal conditions of navigation. Any general statements in the opinions in those cases must be read in connection with the inhibiting effect of the absence of lights in the special situations therein found to exist. And those situations were quite different from the facts of the instant case before us. See, Publicover **v.** Alcoa Steam Ship Co., 2 Cir., 168 F.2d 672; Lind v. United States, 2 Cir., 156 F.2d 231; The Pierre Loti, 78 Lloyd's List L.R. 193; The Dominion Monarch, 71 Lloyd's List L.R. 110, affirmed 73 Lloyd's List L.R. 229. Cf. Oriental Trading & Transport Co. v. Gulf Oil Corporation, 2 Cir., 173 F.2d 108.

Here, Captain Gillette testified that the bearing of the New Mexico remained constant from the time of sighting until her lights were seen. This indicated that, if the vessel was approaching, she was on a collision course, and, as she was on the starboard bow of the Oregon, it was the duty of the latter to stay out of her way. A prudent seaman would not have waited to ascertain whether a dark vessel to starboard was approaching or going away, but would have acted immediately to get off the possible collision course.

▆▆▆ Nor did the District Judge err in absolving the New Mexico from fault in failing to show her lights earlier. Imperative wartime orders for the blackout of vessels cannot be lightly ignored. And such orders would indeed be of little use, if a battleship, immediately upon sighting the loom of a vessel of unknown nature and nationality, must turn on her running lights. See Petition of United States (The Friar Rock), D.C., 69 F.Supp. 538, 542. There must be a balancing of two perils, wartime attack and collision, to determine which is dominant. As was said by District Judge Goddard, in The Corozal, D.C., 62 F.Supp. 123, 126:

"When confronted with a situation of special circumstances, such as the *imminent* danger of collision, it is the duty of a vessel, even when proceeding without lights pursuant to orders of the Navy, to promptly *turn on her running lights to warn the other vessel of her position and heading.*" (Italics ours.)

And, as we have held, after the lights of both vessels, the Oregon and the New Mexico, came on, there was ample time and opportunity for effective avoiding action by the Oregon.

▆▆▆ No just complaint can be made of the action of Captain Brown of the New Mexico immediately prior to the collision, which was taken only when it was apparent to him that it was too late for the Oregon to avert a collision by her own action. He then put the New Mexico under full right rudder, with full back on all her engines, and sounded one blast on her siren. It seems a fair assumption on his part, particularly in the absence of any signal from the Oregon, that the Oregon would steer right rather than left. And courts are rather unwilling to judge strictly the avoiding action taken by the privileged vessel, when, as here, this action must be taken in extremis due to the fault of the burdened vessel. See, Wilson v. Pacific Mail Steam Ship Co., 276 U.S. 454, 48 S.Ct. 369, 72 L.Ed. 651; The Piankatank, 4 Cir., 87 F.2d 806, 809–810; Matson Navigation Co. v. Pope & Talbot, Inc., 9 Cir., 149 F.2d 295; The Nordpol, 2 Cir., 84 F.2d 3, certiorari denied 299 U.S. 586, 57 S.Ct. 111, 81 L.Ed. 432.

▆▆▆ This brings us to the charge, first made by appellants in their amended libels, of negligence, contributing to the collision, on the part of the destroyers. As the District Judge found, this charge, too, is without substance. When the Oregon was sighted, before her lights came on, she was challenged by the Sims on Oregon's star-

board and the Hughes on her port, by means of the blinker tube which is credited with an effective range of 4 miles. This challenging continued until after both the Oregon and New Mexico had shown their lights. Those on the Sims and the Hughes then had every reason to believe that the signals of the blinker tubes had been perceived by the Oregon, and that with the Oregon and New Mexico both lighted and still distant enough to avoid any collision, there was no hazard which called for further action from the destroyers. Indeed, any further signalling by the destroyers might well have harmed the Oregon by diverting the attention of her officers to the destroyers and away from the New Mexico.

Little need be said as to the conduct of the naval vessels after the collision. Indeed, appellants do not seem seriously to stress this point. The search-light of the New Mexico disclosed the damage to the Oregon. For about an hour, the naval vessels manoeuvered in the vicinity of the collision. The Sims was ordered to escort the Oregon as long as was necessary, when the Oregon decided to proceed on her way. And the Sims remained with the Oregon until about 10:30 A.M., when Captain Gillette of the Oregon informed the Sims that the assistance of the Sims was no longer needed. Whereupon, the Sims rejoined the formation of the other naval vessels.

We must sustain the District Judge's conclusion that the Captain of the Oregon was free from negligence in either his decision to make for the port of Boston or his seamanship in attempting to carry out that decision. At about 10:30 A.M. the Oregon was off the Nantucket Shoals Lightship, she was making good speed, practically all water had been pumped from her holds and conditions of sea and weather were favorable. And Captain Gillette had no reason to anticipate the unfavorable change in the weather which began about an hour later, and steadily became worse until the sinking of the Oregon in the early afternoon.

For the reasons hitherto set out, the decree of the District Court is affirmed.

Affirmed.