SOCIALIST WORKERS PARTY et
al., Plaintiffs,

v.

ATTORNEY GENERAL OF the UNITED
STATES et al., Defendants.

No. 73 Civ. 3160.

United States District Court,
S. D. New York.

June 30, 1978.

See also 458 F.Supp. 923.

Leonard B. Boudin, Rabinowitz, Boudin & Standard, New York City, Margaret Winter, Mary B. Pike, New York City, for plaintiffs.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, Thomas E. Moseley, Stuart I. Parker, Frank H. Wohl, Asst. U. S. Attys., New York City, for defendants Attorney General of the United States, Director of the Federal Bureau of Investigation, et al.

## OPINION

GRIESA, District Judge.

This is an action brought by two related political organizations, the Socialist Workers Party ("SWP") and the Young Socialist Alliance ("YSA"), and members of these organizations, claiming that various agencies and officials of the federal government have violated plaintiffs' constitutional and other legal rights.

Plaintiffs have moved under Fed.R.Civ.P. 37(b)(2)(D) to adjudge the Attorney General of the United States in contempt for failure to obey an order of this Court of May 31, 1977. The latter order directed defendant Federal Bureau of Investigation to produce

to plaintiffs' counsel the files of eighteen FBI informants, with the express direction that plaintiffs' counsel were prohibited from revealing the identities of the informants or any other information contained in the files to anyone other than the attorneys specified in the order.

The Second Circuit Court of Appeals, in an opinion dated October 11, 1977, held that the May 31, 1977 order was issued within the District Court's lawful discretion. *In re United States,* 565 F.2d 19 (2d Cir. 1977). A petition for rehearing to the Court of Appeals, with a suggestion for rehearing *en banc,* was denied on March 9, 1978, no active judge, or judge who was a member of the panel, voting for rehearing. On June 12, 1978 the Supreme Court denied the Government's certiorari petition, Chief Justice Burger and Justices White and Powell announcing they would grant the petition.

Although the order was directed to the FBI, the Attorney General has now assumed the personal responsibility for deciding whether or not the order is to be complied with. The Attorney General asserts that this assumption of responsibility is required by 28 C.F.R. §§ 16.23 and 16.24(b).

In an affidavit dated June 13, 1978, confirmed by subsequent submissions made to the Court by the United States Attorney for the Southern District of New York, the Attorney General has stated that he will not comply with the order of May 31, 1977, and that neither the Department of Justice nor the FBI will produce the informant files specified in that order.[1]

The Attorney General makes the following arguments in opposition to a finding of contempt:

(a) That it would be a grave and almost unprecedented step to hold a cabinet officer in contempt of court, particularly for failure to comply with a discovery order;

(b) That his refusal to obey the order stems from a desire to protect an important public interest—*i. e.,* the need to ensure the confidentiality of informants so that informants will not be deterred from assisting in the detection of crime;

(c) That his refusal to obey the order has the further purpose of preserving the Government's right to obtain "full appellate review" of the May 31, 1977 order, which he declares is thus far "unreviewed."

(d) That the Court should refrain from enforcing the May 31, 1977 order, and should impose sanctions other than contempt—*i. e.,* adopt methods of dealing with the informant issues that do not involve production of the actual informant files to plaintiffs' counsel.

This Court cannot accept the Attorney General's position. No one can deny that it is a grave step to enforce a court order to the extent of holding the Attorney General of the United States in contempt. However, the issues in this case are grave in the extreme, involving charges of abuse of political power of the most serious nature. Plaintiffs allege, among other things, that the FBI used its very considerable power to conduct a systematic covert campaign to manipulate and disrupt the plaintiff organizations and interfere with their lawful activities. Plaintiffs allege that a prime device used in this campaign was to infiltrate the plaintiff organizations with paid, undercover informants, who were instructed to take various actions designed to harm the organizations, and to furnish the FBI information so that the FBI could take additional steps to harass and hamper the organizations and their members. Plaintiffs also allege that, aside from this campaign to manipulate and disrupt, there was a serious invasion of constitutional rights in the very fact of the pervasive intrusion and surveillance carried out by the undercover informants with respect to the peaceful political

---

1. The Attorney General would consent to produce four of the files, involving informants who have agreed that their identities may be revealed. However, since the Attorney General would produce these four files only in some-what expurgated form, there would not be full compliance with the May 31, 1977 order even as to the four files; and there is a total refusal to produce the other fourteen files.

activities of the organizations and the personal lives of members, accompanied by the use of these informants to obtain all manner of confidential documents, including membership lists and financial records.

Plaintiffs urge that the activities of the FBI informants were of a radically different character than legitimate use of informants for valid law enforcement purposes. Plaintiffs contend that there was no valid law enforcement or crime-detection purpose involved in the FBI surveillance and the other activities carried out by the FBI against the SWP, the YSA and their members. In this connection, it should be noted that in September 1976, some three years after this action had been commenced, and after a Senate committee[2] had severely criticized the FBI with respect to its activities against the SWP and the YSA, Attorney General Levi terminated the investigation of the SWP.

■ It is not only in plaintiffs' interest, but in the broad public interest, that plaintiffs be afforded a fair opportunity to obtain and present the essential evidence about this alleged wrongdoing. The issues in this case relate to the most fundamental constitutional rights, which lie at the very foundation of our system of government—the right to engage in political organization and to speak freely on political subjects, without interference and harassment from governmental organs. Since the allegations relate to the highest levels of government,[3] it is entirely appropriate for a court to enter an order against a cabinet officer, if necessary, for the production of the essential evidence, and to adjudge that cabinet officer in contempt if he refuses to obey the order.

■ For reasons to be explained hereafter, this Court concludes that the FBI informant files constitute a unique and essential body of evidence regarding the allegations of wrongdoing in this case. The Court further concludes that, although it is neither necessary nor practical to have all such files (numbering over 1300) produced or used as evidence, it must be established as a principle in the conduct of this case that plaintiffs' counsel are entitled to production of a representative selection of these informant files, without deletions or expurgations— such production to be decided upon *by the Court,* and not to depend upon the unilateral terms and conditions set by the FBI or the Attorney General. In this regard, the following discussion in *Rosee v. Board of Trade,* 35 F.R.D. 512, 515 (N.D.Ill.1964) is instructive:

> "Unless the privilege is conferred by statute, the legitimacy of the privilege claimed must be determined by the Court. 'Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers.' *United States v. Reynolds,* 345 U.S. 1, 9, 73 S.Ct. 528, 97 L.Ed. 727 (1953).
>
> \* \* \*
>
> "Without statutory authority, an executive officer may not erect a privilege which will bar judicial scrutiny. To allow such action, particularly where government agents are numbered among the defendants, would enable such an officer (here, the Secretary of Agriculture) to draw a cloak of secrecy around the acts of subordinates and thereby preclude ultimate determination of the propriety of their official conduct."

Plaintiffs' request for eighteen informant files is unquestionably a good faith effort to arrive at a representative selection of the files. In view of the total number of such files in existence, it is a most modest request indeed. Although the Court has granted the request for production, it has imposed certain important conditions over

---

**2.** Senate Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, Final Report, S. Rep. No. 94–755, 94th Cong., 2d Sess. (4 volumes 1976).

**3.** No allegation has been made as to any personal wrongdoing by the present Attorney General, Griffin B. Bell. The basic allegations in the case relate to periods of time before Mr. Bell took office. One former Attorney General, John Mitchell, has been named personally as a defendant. Moreover, the Attorney General of the United States is named as a defendant by title.

plaintiffs' objections. The Court has ordered that the information in the files is only available to plaintiffs' attorneys, and cannot be revealed even to the clients except to the extent expressly authorized by the Court in further proceedings.

 The Attorney General's assertion that the public interest requires ensuring the confidentiality of informants is a reiteration of the position taken by the FBI throughout these proceedings. This Court has consistently recognized the need to give the matter of the confidentiality of informants the most careful consideration. It has been the purpose of the Court, often expressed, to handle the case in such a way as to keep any public exposure of the identities of FBI informants to an absolute minimum.[4] However, the informant privilege is not absolute. *Roviaro v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). The Government's interest must be weighed against other factors. One factor here is that there is no ongoing investigation of the SWP or the YSA which will be compromised by the production of informant files. Thus, the Government is asserting a "generalized interest in confidentiality" (*see United States v. Nixon,* 418 U.S. 683, 713, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974))—that is, the concern that informants in other situations may be deterred if confidentiality is not maintained in the present case. Of greater significance is the fact that this is *not* the normal situation where the problem is the disclosure of information relating to informants who have unquestionably been used in legitimate efforts to detect crime. The present case involves the serious allegation that the FBI informants were used for *unlawful* purposes—that is, to monitor and interfere with legitimate political and private activities. Thus the questions about production of informant files in the present case cannot be resolved by looking solely at the interest in informant confidentiality, as the

Government would have us do. There are countervailing considerations which deeply affect the public good. These considerations relate to the interest of the citizens of this country in being protected against the illegal and unconstitutional use of informants to interfere with the exercise of basic political rights and to invade the privacy of persons and organizations. One obvious way to protect against such abuses is to allow private plaintiffs fair opportunity to recover for such abuses to the extent legally allowed, with the attendant exposure of any misuse of Government power to public view. These considerations reinforce the conclusion that there is ample justification for the enforcement of an order against the Attorney General which is designed to provide essential evidence in this case to plaintiffs' attorneys.

The discussion in *United States v. Hemphill,* 369 F.2d 539, 542 (4th Cir. 1966) is instructive. There the Government was a plaintiff, and the Court of Appeals granted a writ of mandamus against a district court order compelling disclosure of certain Government informant files. However, the Court of Appeals emphasized that in certain instances the informant privilege would need to give way to other interests relating to the administration of justice. The discussion of the Court, while relating to the Government as a plaintiff, has application to the Government as a litigant in any capacity.

"[T]he policy favoring anonymity of informants must give way when it conflicts with the countervailing policy favoring fair and orderly trials and pretrial procedures.

"This was the concern of the District Judge. We share his conviction that when the United States, a cabinet official, or an agency of the United States comes into the Court as a plaintiff, they are subject to the same rules as private

---

4. The Court ordered that the *procedure itself* for producing files to plaintiffs' attorneys should not be revealed except as expressly authorized by the Court. It should be noted that the latter direction was strictly obeyed by plaintiffs' attorneys. No word about the procedure was revealed or leaked by them. The only disclosure of the procedure came after the FBI sought review in the Court of Appeals, and the Court of Appeals ordered the matter unsealed.

litigants, and the open disclosure which is now demanded of litigants in the federal courts, because of its fairness and its contribution to accuracy in the factfinding process, is equally demanded of such plaintiffs."

■ A principal justification asserted by the Attorney General for his refusing compliance with the May 31, 1977 order is that such refusal is necessary in order to preserve the right to "full appellate review." The Attorney General contends that the Government has been unable to obtain "review on the merits with respect to the Court's order" in the appellate proceedings which have taken place.

The theory that full appellate review has thus far been denied, and that there is some other procedure which will provide an additional quantum of review is repeated over and over again in the Attorney General's affidavit and in the brief filed on his behalf. However, this proposition is simply invalid.

At no point in the Attorney General's affidavit or in his brief is there any attempt to articulate or explain what additional measure of review would be available through some other appellate proceeding. Not one judicial authority is cited to illustrate or define what further appellate review would add or accomplish.

As will be described more fully hereafter, the Court of Appeals dismissed the appeal, *but* entertained and ruled upon the mandamus petition. This ruling expressly resolved each relevant question of law—that is, that the informant privilege applies; that it is a qualified privilege, which can be overcome by a showing that the need for disclosure outweighs the claim of privilege; and that a district judge, in the exercise of his discretion, may permit opposing counsel to participate in and assist him in the conduct of *in camera* proceedings under a pledge of secrecy. Finally, the Court of Appeals held that the May 31, 1977 order was a valid exercise of discretion under these rules. *In re United States*, 565 F.2d 19, 22–23.

This review responded precisely to the "Question Presented" in the Government's brief relating to the mandamus petition and appeal to the Second Circuit, which was phrased:

"Whether the District Court abused its discretion in directing release to plaintiffs' counsel of eighteen confidential informants' identities and files in a civil action against the Government."

The Government regarded this same question as the proper question both for mandamus petition and appeal.

The problem, from the Government's standpoint was not that the Court of Appeals failed to rule on the issues, but that the Court ruled adversely to the Government.

■ The authorities are absolutely clear that, in connection with a discovery problem such as the one involved in the present case, the issue on appellate review, regardless of the form such review takes, is the question of whether the district court abused its discretion. Thus, no additional measure of review would be available to the Government in this case in any further proceedings in the appellate courts. *Baker v. F & F Investment*, 470 F.2d 778, 781 (2d Cir. 1972), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *Carr v. Monroe Manufacturing Co.*, 431 F.2d 384, 389 (5th Cir. 1970), *cert. denied*, 400 U.S. 1000, 91 S.Ct. 456, 27 L.Ed.2d 451 (1971); *Swanner v. United States*, 406 F.2d 716, 718–19 (5th Cir. 1969). The Government was asked at oral argument to provide decisions illustrating its theory that there would be a broader review of the Court's discovery ruling on appeal than was afforded on mandamus. The Government then provided the Court with a group of cases. These cases are either off point, or illustrate the opposite of the Government's theory. *See Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215 (4th Cir. 1976); *Carey v. Hume*, 160 U.S.App.D.C. 365, 492 F.2d 631, *cert. dismissed*, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974); *Hyde Construction Co. v. Koehring Co.*, 455 F.2d 337 (5th Cir. 1972); *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), *cert. denied*, 401 U.S.

974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971); *Radiant Burners, Inc. v. American Gas Association,* 320 F.2d 314 (7th Cir.), *cert. denied,* 375 U.S. 929, 84 S.Ct. 330, 11 L.Ed.2d 262 (1963); *Hyam v. American Export Lines, Inc.,* 213 F.2d 221 (2d Cir. 1954).

■ The Attorney General goes so far as to contend that he would be justified in disobeying the May 31, 1977 order even if it meant his being held in civil contempt, because this would be a legitimate device for obtaining "full appellate review." The argument about the availability of fuller review has been dealt with. Moreover, it is the settled rule that a party to a civil case does not have a right of appeal from a civil contempt citation until final judgment. *Fox v. Capital Co.,* 299 U.S. 105, 107–08, 57 S.Ct. 57, 81 L.Ed. 67 (1936); *International Business Machines Corp. v. United States,* 493 F.2d 112, 117–19 (2d Cir. 1973), *cert. denied,* 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974); *Hodgson v. Mahoney,* 460 F.2d 326, 328 (1st Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 519, 34 L.Ed.2d 488 (1972).

The Attorney General argues that he has a kind of option to accept sanctions under Rule 37 short of compliance with the order. The sanctions suggested by the Attorney General, which will be analyzed hereafter, are nothing but attempts to avoid or drastically reduce the effect of the May 31, 1977 order. In other words, the Government seeks to use the weapon of defiance of the order to dictate its own terms as to what it will or will not do in connection with providing evidence in this case.

■ This position cannot be justified. The Attorney General has no "right" to defy a court order for discovery, and accept sanctions of his selection. *United States v. Costello,* 222 F.2d 656, 662 (2d Cir. 1955), *rev'd on other grounds sub nom. Matles v. United States,* 356 U.S. 256, 78 S.Ct. 714, 2 L.Ed.2d 741 (1958); *Edgar v. Slaughter,* 548 F.2d 770, 772 (8th Cir. 1977). On the contrary, his duty is to obey the order. The Court possesses, and must possess under our system of law, the authority to enforce an order for the production of evidence, with a view to the interests of all parties in a litigation, and with a balanced view of the public interests involved. The Court must not fashion its orders and remedies solely at the behest of any one party, even if he is the Attorney General of the United States.

Rule 37(b)(2)(D) of the Federal Rules of Civil Procedure expressly provides for contempt of court as a sanction which may be imposed in lieu of, or in addition to, other sanctions.

In *Bank Line v. United States,* 163 F.2d 133, 138 (2d Cir. 1947), Judge Augustus Hand, writing for Judges Learned Hand and Clark, stated:

> "It has been the policy of the American as well as of the English courts to treat the government when appearing as a litigant like any private individual. Any other practice would strike at the personal responsibility of governmental agencies which is at the base of our institutions."

■ The Government asserts that the Attorney General's refusal to comply with the May 31, 1977 order is made in the utmost good faith. While this Court does not doubt for a minute the Attorney General's sincere interest in protecting legitimate informant confidentiality, the effect of the Government's position at this juncture in the present proceedings is to create unjustified delay and obstruction to the production of evidence in a case involving serious charges of illegal use of informants. In any event, the good faith motive of a party does not justify disobedience of a court order. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949); *Sawyer v. Dollar,* 89 U.S.App.D.C. 38, 48, 190 F.2d 623, 633 (1951), *vacated as moot,* 344 U.S. 806, 73 S.Ct. 7, 97 L.Ed. 628 (1952). For instance, in a case recently tried by this Court, the Department of Justice obtained a civil contempt citation and then a conviction for criminal contempt of a young woman who refused to give testimony when ordered to do so by the court, despite the fact that the refusal resulted from the woman's honest and reasonable belief that

she would be killed if she testified. *United States v. Alpert,* 76 Cr. 497 (S.D.N.Y. Oct. 6, 1977).

It is time for the May 31, 1977 order to be complied with. It is a modest order, which recognizes the legitimate interests of both plaintiffs and the Government, and it takes into account both the public interest in informant confidentiality and the public interest in exposing illegal uses of informants and abuses of governmental police power. Compliance with this order is an essential prerequisite to the further conduct of this litigation. The order is far short of anything approaching "wholesale" revelation of informant files or identities. To repeat, it requires disclosure of eighteen (out of 1300) informant files to plaintiffs' counsel on a confidential basis. Although the Court of Appeals expressed concern about possible excessive disclosure which might occur in the future (which concern the District Court will unquestionably heed), the opinion contained no reservation whatever about the propriety of the present order. The order has been the subject of a year of appellate review. It must now be enforced.

The Supreme Court has emphatically affirmed the power and the duty of the Judiciary to declare the law in connection with claims of governmental privilege asserted by the highest officials in the country. The Supreme Court has affirmed the power of the Judiciary to enter an order for the production of evidence even against the President of the United States. *United States v. Nixon,* 418 U.S. 683, 704–05, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Surely these rules apply to a cabinet officer.

 The power to enter an order against an official necessarily implies the power to enforce that order by appropriate means, including holding the official in contempt of court. *Sawyer v. Dollar,* 89 U.S. App.D.C. 38, 190 F.2d 623 (1951), *vacated as moot,* 344 U.S. 806, 73 S.Ct. 7, 97 L.Ed. 628 (1952). There the Secretary of Commerce, the acting Attorney General, and other high officials were held in civil contempt for failure to obey a court order and for counseling disobedience of the order. This order

was made at the conclusion of litigation. However, the principle regarding the applicability of civil contemt in cases of disobedience of court orders by cabinet officers applies with equal force in the present case.

In the *Sawyer* case, the Court held the officials in civil contempt, granted a short time during which they could purge themselves of contempt and avoid imprisonment, and ordered that they should surrender themselves for imprisonment if they did not purge themselves of contempt within the specified period. The officials complied, and imprisonment was unnecessary.

In view of the factual record, and in light of the applicable authorities, the Court rules:

(a) The order of May 31, 1977 remains in force, and the Attorney General and the FBI are hereby given notice that they are to comply with that order, and to produce the files as directed, forthwith. In order for the Attorney General and his advisors to have an opportunity to review this opinion, it will be deemed to be compliance with the order if the files are produced to plaintiffs' counsel by 5:00 p. m. July 7, 1978. If such production is made at or before that time, the Attorney General will not be in contempt.

(b) If the production of the files is not made at or before the time specified, the Attorney General will be in civil contempt of court thereafter, until he purges himself of contempt by directing the production of the files.

 At this time the Court declines plaintiffs' request for an order of imprisonment. The authorities hold that, in connection with civil contempt, the minimum sanction necessary to obtain compliance is to be imposed. *Shillitani v. United States,* 384 U.S. 364, 371, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 450–51, 31 S.Ct. 492, 55 L.Ed. 797 (1911). The announcement by the Attorney General that he will not comply with the court order justifies, and indeed necessitates, specific notice to the Attorney General that he will be in civil contempt of court if he continues in this non-

compliance. It is obvious that the status of civil contempt would, in and of itself, be a severe sanction against the highest law enforcement officer in the United States. The Court earnestly hopes that the Attorney General will now carry out the order, and that contempt will be entirely avoided. If this does not occur, and if the Attorney General is in civil contempt and makes no effort to purge himself, the Court will entertain a motion for more drastic sanctions.

## II.

This action was commenced in July 1973. The plaintiffs consisted of the Socialist Workers Party, the Young Socialist Alliance, and certain named members of these organizations. Although originally brought as a class action, subsequent pleadings have dropped the class allegations. The original complaint named as defendants, by title, the Attorney General of the United States, the Director of the Federal Bureau of Investigation, and other governmental officials.

Certain persons were named as defendants individually, including former Attorney General John Mitchell. The list of defendants included "Unknown Agents of the United States Government." No official or employee of the FBI was individually named as a defendant.

The original complaint alleged, with varying degrees of specificity, wrongs committed by members of the federal government designed to interfere with the rights of plaintiffs under the federal Constitution and certain federal statutes. Injunctive relief was requested. In addition, claims for damages were asserted against the specifically named individual defendants and the "Unknown Agents."

The United States of America was not named as a defendant in the original complaint.

All the individual defendants named in the original complaint were dismissed from the action for lack of personal jurisdiction, except Richard M. Nixon, John Mitchell and John W. Dean, III. A motion for dismissal has been made on behalf of defendant Nix-

on but decision has been deferred. The various defendants who have not moved for dismissal have denied liability.

The basic issues in the case revolve around the following positions, which are summarized here very briefly. Plaintiffs contend that they are peaceful political organizations devoted to socialism, and also devoted to various lawful causes such as civil rights, women's liberation, and the anti-Vietnam War movement. Plaintiffs' socialist philosophy appears to have its genesis in the teachings of Leon Trotsky. Plaintiffs contend that, despite this Marxist philosophical connection, they have a long record of peaceful pursuits, totally inconsistent with violence or crime. Defendants basically take the position that many, if perhaps not all, of the investigations or other activities carried out vis-à-vis the SWP and the YSA were justified by the need to guard against Marxist revolutionary tactics, including violence and crime.

As noted earlier, in September 1976, Attorney General Levi directed the FBI to terminate its "investigation" of the SWP (presumably including the YSA). The Attorney General's memorandum of September 9, 1976 to the Director of the FBI stated in part:

"The information presented by the FBI and CIA does not constitute specific and articulable facts giving reason to believe the Socialist Workers Party will engage in violence in the foreseeable future; thus the standard set by the domestic security guidelines has not been met. There is no evidence of conduct that would justify an investigation under the foreign counterintelligence guidelines. . . . This type of information should be carefully watched to see whether in the future a reconsideration of this case is required. Similarly, if new facts or circumstances emerge which change the character of the group's domestic conduct in such a way as to justify investigation, a reconsideration would be in order."

The discovery process in this case has been unusually complex for a variety of

reasons. The Government has admitted that it possesses about 8,000,000 documents relating to the SWP, the YSA, and their members. All parties have endeavored to be as selective as possible regarding document discovery, so as to avoid involving millions of documents in discovery and evidence at trial. So far about 65,000 pages of documents have been produced by the Government—less than one percent of the total.

In general, the various Government agencies have been cooperative, and appear to have been candid, in responding to discovery requests. The United States Attorney's staff is entitled to special commendation for their efforts in connection with the discovery in this case.

However, certain instances of misrepresentations by the FBI in connection with discovery have occurred. These unfortunate instances furnish some plausibility for plaintiffs' assertion, in connection with their request for informant files, that they need at least a representative sample of actual, complete files, and that they should not be relegated to summary information or expurgated documents prepared for them by the Government.

One critical instance where the FBI was less than candid occurred in connection with plaintiffs' first set of interrogatories directed to the FBI. These interrogatories were served in December 1973. By the time of these interrogatories plaintiffs had obtained, among other things, a copy of a memorandum dated April 28, 1971 from the Director of the FBI announcing the discontinuance of certain "counterintelligence programs"—including programs entitled "COINTELPRO—New Left" and "Socialist Workers Party—Disruption Program." [5] The FBI furnished sworn answers to the interrogatories February 5, 1974. These answers stated, among other things, that COINTELPRO—New Left was not applicable to either the SWP or the YSA; and that the purpose of the Socialist Workers Party—Disruption Program "was to alert the

public to the nature and activities of the Socialist Workers Party and thus to neutralize the Socialist Workers Party." The answers further described the tactics employed in the Socialist Workers Party—Disruption Program as consisting of the furnishing of information to law enforcement agencies regarding violations of the law by SWP and YSA members; furnishing the news media pertinent information regarding the objectives and activities of these organizations, and furnishing "information concerning the nature and activities of SWP and YSA to organizations and individuals associated with SWP, YSA or their members."

In March 1975 the FBI produced documents which showed that COINTELPRO—New Left was in part directed to the SWP and YSA. The documents showed FBI plans and activities of both COINTELPRO—New Left and Socialist Workers Party—Disruption Program which were far different from the bland descriptions in the answers to interrogatories. The documents indicate that the purpose of the FBI in these programs was to destroy or cripple the SWP and YSA by a host of covert means—to isolate the SWP and YSA from sympathetic organizations, to turn members against one another, and to impose burdens and barriers to the functioning of the SWP, the YSA and their members. These are activities which are not countenanced in the prosecution and punishment of actual criminals, under our system of government.

The documents show FBI plans to place informants within the SWP and YSA to split the organization structure and foment dissent. According to the documents, the FBI interfered with travel reservations of members, took steps to cause speaker hall rentals to be canceled, and circulated false information about the times and places of meetings. The documents show that the FBI caused local law enforcement officers to make arrests and break up functions, not for the purpose of assisting in the enforcement of local laws, but for the purpose of

---

**5.** This memorandum was presumably among the materials obtained in October 1973 by NBC newsman Carl Stern from the FBI under the Freedom of Information Act.

disrupting the SWP and YSA. In one instance, the FBI arranged for a raid of a SWP summer camp for alleged state law violations, and considered it a success when the SWP was forced to sell the camp property. According to the documents, the FBI attempted to secure the eviction of the Philadelphia SWP office from a public building. The documents show that the FBI sent fraudulent letters, purporting to be from "distraught parents," to school administrators, in order to induce these administrators to discharge SWP or YSA members from teaching positions. According to the documents, the FBI sent and circulated a wide variety of communications and leaflets, purporting to be in the name of various individuals and organizations, and designed to create hostility and dissension within the SWP and YSA, and isolate these organizations from other allied organizations. It appears that in some cases informants directly participated in the carrying out of the disruption activities. In other instances the informants furnished the FBI with information which enabled regular agents of the FBI to conduct the disruption activities. The observations of the informants assisted the FBI in assessing the success or failure of disruption activities.

In the fall of 1974 plaintiffs made a motion for a preliminary injunction to prevent FBI informants from attending the national convention of the YSA to be held December 28, 1974. The District Court granted the injunction. *Socialist Workers Party v. Attorney General,* 387 F.Supp. 747 (S.D.N.Y.1974). The Court of Appeals reversed. 510 F.2d 253 (2d Cir. 1974). With regard to the issue of whether the use of FBI informants violated plaintiffs' rights the Court of Appeals noted:

"Such an issue deserves treatment *on a full record* and with ample time for reflection, initially by the district court, later by this Court, and perhaps ultimately by higher authority."
510 F.2d at 256 (emphasis added).

In May 1976 lengthy conferences were held to attempt to organize the remaining discovery problems, which were complex.

A list of eleven alleged illegal activities was arrived at which were agreed to constitute the basic types of illegal activities claimed by plaintiffs to have been engaged in by defendants. The list was as follows (Minutes May 14, 1976, pp. 75, 84–85):

1. Break-ins and unauthorized seizure or retention of property.
2. Electronic surveillance.
3. Consensual monitoring by recording devices.
4. Use of informants.
5. Physical surveillance.
6. Undercover surveillance.
7. Mail covers.
8. Mail intercepts.
9. Interviews by FBI agents of organization members and third persons.
10. COINTELPRO or disruption program.
11. Placing plaintiff organizations and their members on lists of security risks.

There was considerable discussion in May 1976 about the problem of discovery of the informant files. The Government attorney announced the Government would claim privilege as to these files. However, the Government attorney acknowledged what was and is abundantly clear—that the issues relating to the FBI informants are crucial, and indeed may be the most significant part of the case (Minutes May 4, 1976 pp. 131, 133). The Government at that time requested that the issue of discovery as to the informant files be deferred. The request was that the discovery process on the informant issue be taken step by step.

Shortly before this discussion, plaintiffs had served a set of interrogatories specifically directed to the question of informants. It was agreed that answers to the interrogatories would be made first and that thereafter the parties and the Court could deal with the question of what document discovery would be necessary and appropriate on the informant issue (Minutes of May 4, 1976 pp. 132, 145).

In response to these interrogatories, the FBI furnished certain information pertain-

ing to each of the 1331 informants which the FBI said it had used since 1960. Each informant was identified only by code number. Information of a rather general nature was given, not including names or localities, or specific descriptions of activities sufficient to identify the informants.

In May 1976 plaintiffs filed an amended complaint.[6] This complaint joined the United States of America as a defendant, and asserted claims for damages against the United States under the Federal Tort Claims Act. The amended complaint also joined three FBI agents, who were alleged to have been responsible for burglaries against plaintiffs' premises. On July 8, 1976 a second amended complaint was filed, making certain changes in the prayer for relief.

On May 7, 1976 the Government filed a motion which in effect sought to strike any claim for damages against the United States. The basic contentions of the Government were (1) that the claims pleaded by plaintiffs against the United States were not valid claims under any state law, and that therefore they did not form a basis for recovery under the Tort Claims Act; and (2) that plaintiffs had not complied with the requirement of 28 U.S.C. § 2401(b) that a claimant under the statute must present his claim in writing to the appropriate federal agency within two years after such claim accrues.

This motion was extensively briefed and argued. This Court denied the motion on July 29, 1976, ruling that a factual record needed to be developed both on the nature of the causes of action and their times of accrual. However, the Court stated that it would entertain an application for a preliminary trial relating to these issues. It should be noted that, although the Government thereafter repeatedly urged that discovery of informant files was unnecessary since any damage cause of action relating to the use of informants was precluded as a matter of law, the Government did not

make any request for a preliminary trial until October 1977, after the Court of Appeals had denied the Government's appeal and mandamus application in respect to the informant files. It should be noted that the Court of Appeals opinion made no suggestion of any preliminary or truncated trial as a predicate to the production of the eighteen informant files.

Following the Court of Appeals opinion, this Court made a thorough review, for the second time, of the arguments of the Government that the damage claims against the United States should be dismissed as a matter of law, and ruled that there could be no such dismissal (Minutes November 3, 1977 pp. 2–15).

It is now necessary to return to the summer of 1976, and to the immediate background of plaintiffs' motion for the production of nineteen informant files, the issue on this motion later being reduced to eighteen files because of the voluntary production of one file.

In the summer of 1976 one Timothy Redfearn was arrested by the Denver police. It was quickly revealed that he was an FBI informant against the YSA, and that, among other things, he had committed burglaries of YSA premises. It was apparent that the FBI had full knowledge of these burglaries. Finally, it was clear that the FBI had intentionally falsified the answers to interrogatories to conceal the fact of the burglaries.

Shortly thereafter plaintiffs moved for the production of the informant file on Redfearn and the files on six other informants whose identities had, in one way or another, been revealed to plaintiffs. Following an examination of these files, in August 1976, plaintiffs moved for production of nineteen other informant files. These related to informants whose identities were not known, but who were indicated in the interrogatory answers by number, accompanied by a limited description which was used by plaintiffs as a basis for

6. Shortly before this the FBI had produced in this action documents which appear to relate to over 90 burglaries committed by the FBI against the SWP in New York, New Haven and Los Angeles.

their selection. Plaintiffs asserted, as reasons for this motion, (1) that the interrogatory answers, particularly in view of the indication of falsification, were inadequate to provide sufficient discovery and evidence on the FBI informant issue; (2) that the seven files of informants whose identities had become known were not sufficiently representative and were inadequate to provide discovery and evidence on the issue; (3) that, without waiving the right to request additional informant files, plaintiffs had made what they hoped was a representative selection of present and former member informants, informants who had engaged in significant activities, and certain non-member informants.

The FBI opposed the motion on the ground of informant privilege. As already noted, the Attorney General terminated the investigation of the SWP and YSA on September 9, 1976, so that thereafter there was no investigation which could be compromised by the production of the informant files. However, the FBI asserted that it owed the duty of confidentiality to the informants to protect them from embarrassment and harm, and that the maintenance of confidentiality was essential to avoid problems with informants in other investigations present and future. As already described, the FBI argued that there was no showing of necessity on the part of plaintiffs sufficient to overcome the interest in informant confidentiality, because plaintiffs' damage claims were legally invalid.

The Government's arguments were made without relation to the contents of the files in question. However, the Court directed the production of files *in camera* for analysis by the Court. Due to the great bulk of files, the Court requested the Government to prepare detailed summaries of the files, which was done. Neither the files nor the summaries were made available to plaintiffs' counsel.

To return to the subject of the interrogatory answers—following the revelation of false answers in connection with the informant Redfearn, the FBI undertook a review of the answers as a whole. On Octo-

ber 8, 1976, the FBI filed amendments to the answers relating to 22 of the informants. A special review at FBI headquarters in Washington was made with respect to the answers to interrogatories filed with respect to the eighteen informants whose files were the subject of plaintiffs' motion. This review resulted in amendments to the interrogatory answers in ten instances, filed October 15, 1976. Under the circumstances, there inevitably remains some question as to the accuracy and completeness of the interrogatory answers as to the FBI informants.

While the motion regarding the FBI informant files was pending, two other motions raising questions of governmental privilege were also under consideration. The Central Intelligence Agency and the National Security Agency had documents and information about activities pertaining to plaintiffs. Both of these agencies claimed the secrets of state privilege with respect to documents and information relating to this case.

Thus, the Court had before it simultaneously the informant privilege claim of the FBI and the secrets of state privilege claims of the CIA and NSA.

Aside from the ultimate questions of privilege, there were in each case the procedural questions of how to handle the materials presented to the Court which related to the determination of the motions. In connection with the CIA and NSA matters, the Court considered the materials so sensitive that the documents in question, and the crucial affidavits (particularly from the CIA), were never shown to plaintiffs, or even their counsel, in the course of determining the motions. The Court ruled in favor of the CIA and NSA in an opinion dated June 10, 1977. A sealed opinion of that date was also filed containing a full description of the relevant circumstances. This was not shown to plaintiffs' counsel.

In connection with the FBI matter, the Court ruled that a different approach was in order. The considerations are set forth in the bench opinion of May 31, 1977, as supplemented by the minutes of June 22,

1977. The relevant portions of these minutes are Appendices A and B to the present opinion.

It should be noted that the 1331 informants used by the FBI against the SWP and YSA during the period 1960–1976 included about 300 member informants and about 1000 non-member informants. According to an affidavit submitted by plaintiffs, there was a total of 73 branches of the SWP and YSA in 1976. The FBI has represented that it had 60 member informants in place in the SWP and YSA in 1976; 85 in 1975; 99 in 1974; 105 in 1973; 116 in 1972; and 109 in 1971. The FBI has given the figures going back to 1960. Somewhat fewer informants had been used in years prior to an apparent step-up of the program in about 1971.

From analysis of the available information, it was clear that the seven informant files voluntarily produced in the summer of 1976 were completely inadequate to provide plaintiffs' counsel with any kind of fair selection of the informant files as a whole. Three of them were totally insignificant because of the brief time periods involved or the marginal relationship of the informant to the SWP or YSA. Only two of the files related to informants who had worked into officer roles. These seven files did not begin to provide a representative coverage of the SWP and YSA chapters in important cities. To be sure, two or three of these files are significant. However, this is a minuscule number in comparison with the total of 300 member informants and the grand total of 1300 informants of all kinds. Moreover, it is important to note that the seven files were substantially expurgated.

In the Court's ruling of May 31, 1977, dealing with the question of the eighteen files, the Court stated that the evidence contained in the FBI informant files undoubtedly constitutes the most important body of evidence in this case, recording in immense detail the activities of the informants, the instructions by the FBI to the informants, and the FBI's evaluations of informant activity. The Court stated that the extensive infiltration of the SWP and YSA by the member informants raises serious questions under the federal Constitution and under various other theories of federal and state law. The Court further noted that the documents in the files indicate that the FBI may have used informants in certain instances to destroy or weaken chapters of the SWP and YSA, to remove private documents for production to the FBI, and to perform other types of activities whose legality was highly questionable. The Court stated in essence that a procedure needed to be arrived at which would permit plaintiffs' counsel to obtain access to some reasonable selection of the files, and also to permit the parties and the Court to arrive at a method of handling the great bulk of the informant file material by summarization or otherwise, with a minimum of disclosure of informant identities. The Court stated:

"I conclude that there is no legitimate reason for the wholesale public disclosure, in the manner of normal discovery, with respect to all the FBI informant files or the identities of all the informants. I am convinced that, with careful analysis and preparation, much of the necessary information about the informant activities can be presented at the trial of this action without identifying specific informants. I discussed this to some extent at the hearing of April 14. However, this preparation and analysis cannot possibly be done without the participation of plaintiffs' attorneys. Neither the Government nor the Court should be relied upon to develop plaintiffs' case.

"It may well be that the files of certain selected informants, and the identities of these informants, should be publicly disclosed in normal discovery proceedings, and that the evidence about these specific informants should be presented at the trial. There are a variety of reasons why this may be necessary and appropriate. However, the question of whether, and to what extent, this should be done, cannot be decided intelligently without the participation of plaintiffs' attorneys.

"Plaintiffs' counsel must have access to the detailed facts about the use of infor-

mants. They have to date been denied access to any such detailed information, except with respect to the seven files produced last summer relating to people whose identity in some way had already been disclosed to them. But these seven files are simply inadequate by a very long way, from providing plaintiffs' counsel with proper information about the activities of the 300 member informants as a whole, to say nothing of the other 1000 or so informants who were not members."

The solution reached by the Court was to order at that time production of the eighteen files to specified attorneys representing plaintiffs, with direction that they should not reveal the identities of the informants or any information in the files to anyone else without specific authorization of the Court.

The Court also stated that the production would undoubtedly go beyond the eighteen files, as there was reason to believe that valuable and important information was contained "in various other" of the informant files. However, the Court reiterated in essence that the handling of the information contained in the other files, whether by summarization or by production of some of these files, would await the analysis of the eighteen files by plaintiffs counsel.[7]

In order to keep publicity to an absolute minimum, the Court directed the attorneys not to reveal even the fact that this order had been entered and this procedure was taking place. The opinion of May 31, 1977 was sealed. It was unsealed only at the direction of the Court of Appeals in the course of proceedings there.

The Court wishes to state that, in five years of experience with plaintiffs' attorneys in this case, these attorneys have demonstrated beyond any question their total reliability. They have proved that, while they may strongly object to certain directions of the Court, they will obey those directions to the letter, including orders of confidentiality.

The Government sought review of the May 31, 1977 order by both appeal and mandamus petition. Implementation of the order was stayed pending the outcome of the appellate proceedings. On October 11, 1977 the Court of Appeals dismissed the appeal and denied the mandamus petition. *In re United States*, 565 F.2d 19. Judge Van Graafeiland wrote an opinion, joined by Judge Webster of the Eighth Circuit, sitting by designation. District Judge Dooling, also sitting by designation, concurred in the result.

The majority opinion expressly ruled on the controlling questions of law—that the informant files are subject to the informant privilege, that this privilege is applicable in civil as well as criminal cases, and that it is a qualified privilege, which is overcome if a party to a litigation carries the burden of showing that the need for disclosure outweighs the claim of privilege. The opinion went on to apply the further rule of law that it is within the discretion of the district judge to permit opposing counsel to participate in and assist in the conduct of *in camera* proceedings under a pledge of secrecy. 565 F.2d at 22–23. Finally, the opinion held that the procedure directed by the District Court in the present case was within its discretion. 565 F.2d at 23.

The Government applied for a rehearing, with the suggestion of rehearing *en banc.* This petition was denied on March 9, 1978, no active judge, or judge who was a member of the panel, voting for rehearing. Judge Webster, by then the new Director of the Federal Bureau of Investigation, did not participate in the action on the rehearing petition.

---

**7.** Judge Van Graafeiland's opinion, in the Court of Appeals, interpreted the May 31, 1977 ruling as suggesting that production "might encompass the full thirteen hundred informant files," and indicated concern that the course on which the District Court had embarked would lead to disclosure for which there is no substantial need. Judge Van Graafeiland warned against "a wholesale disclosure of informants' identities." 565 F.2d at 23–24.

As indicated above, the Court's reference to files beyond the eighteen was only to "various other" files among 1300. In any event, the concern and the warning of the Court of Appeals with regard to excessive production of files will be seriously heeded.

While the petition for rehearing was pending, this Court, as it had done several times previously, conferred with the attorneys to determine whether there would be any way to break the "log jam" on the informant discovery issue so that the case could move to trial. This Court noted that the main feature of the Government's argument in the rehearing petition (and at least a major feature in the earlier mandamus petition) was the argument that the District Court had abused its discretion by failing to make a file-by-file analysis of the informant files and a determination in each case as to whether the need for the file in discovery and evidence outweighed the interest in informant confidentiality. The Court further noted that the Government in its arguments to the Court of Appeals had treated as of little or no value the secrecy imposed upon plaintiffs' counsel in the May 31, 1977 order. Accordingly, after discussion with the attorneys, the District Court made a proposal designed to respond to these arguments made by the Government to the Court of Appeals. The thought was that, although there were important advantages in the view of the District Court to the method employed in the May 31, 1977 order, nevertheless alternative procedures could be considered. The hope was that, in view of the already lengthy appellate proceedings over what was, after all, a preliminary discovery matter, there could be a compromise which would put an end to the motion in the Court of Appeals, and prevent further delay from a possible Government petition to the Supreme Court.

In January 1978 the Court proposed that it would make a file-by-file review in accordance with the argument of the Government in the Court of Appeals as to the correct procedure to be used. Under this proposal the files selected by the Court would be, in accordance with the Government's theory, produced with normal public disclosure, since the Government allegedly had no interest in restricting access to plaintiffs' counsel. The Court undertook this procedure, and on January 27, 1978 stated to the attorneys that it would propose the production of nine of the eighteen files through public discovery. The Court proposed that, if this proposal was acceptable to the parties, and if there could be an end to appellate proceedings so that the case could move forward, the Court would withdraw the May 31, 1977 order and substitute the new procedure.

At the time of the January 27, 1978 proposal, it was expected that the Government would respond and advise the Court if the Government considered that the production of any of the nine files would involve an abuse of discretion, applying legally relevant considerations.

On February 10, 1978 the Government announced that it would object to the production of *all nine* files, but that it was attempting to obtain consents of at least some of the informants so that the files of such consenting persons could be produced.

The Government's objections, covering all nine files, were frivolous, and did not represent a fair response to the Court's proposal. Moreover, the idea that production of informant files should depend on the informants' consent had no basis in the law and had never been mentioned before in all the lengthy proceedings about the informant files in the District Court and the Court of Appeals. This was pointed out to the Government.

The final response of the Government was given February 22, 1978. It had obtained the consents of four of the informants, so that the Government would consent to production of four of the nine files, subject to certain conditions. The Government maintained its objections to the other five files.

The net result was to show that the Government was not really interested in the application of the procedure which it had so strenuously urged upon the Court of Appeals, and which had been applied by the District Court in an attempt to settle the matter. The further result was the injection of an entirely new barrier into the picture—the informants' consent. The whittling down of a compromise figure of nine files to four files was both unfair and unacceptable.

Since no settlement of the informant file matter had been reached, the order of May 31, 1977 remained in effect, subject to further proceedings regarding appellate review.

As already noted, the Court of Appeals denied the petition for rehearing on March 9, 1978. The Supreme Court denied certiorari on June 12, 1978.

The Attorney General, as the official ultimately responsible for any decision not to turn over the FBI documents, filed his affidavit on June 13, 1978, refusing to comply with the order of May 31, 1977.

### III

It is necessary to deal now in more detail with the contention of the Government that sanctions short of contempt should be imposed under Fed.R.Civ.P. 37.

Rule 37(b)(2) provides in relevant part:

*"Sanctions by Court in Which Action is Pending.* If . . . a party fails to obey an order to provide or permit discovery, . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

"(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

"(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

"(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or part thereof, or rendering a judgment by default against the disobedient party;

"(D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination; . . . ."

The Government suggests the following alternative proposed "sanctions":

(1) Plaintiffs would be allowed to "establish from facts within their knowledge" the amount of damages sustained at each SWP and YSA chapter, and would be given the benefit of a presumption that such damages were *prima facie* the result of informant activity. The Government would have the opportunity, and the burden, of proving that there were no such damages, or that any such damages were not caused by informants.

(2) Plaintiffs can go forward with "full discovery" based on the "twelve informant files now available to plaintiffs." Then plaintiffs can present to the Court a kind of "test" case of injury and damages, so that "the Court can determine at that point the extent to which, if at all, information in these files proved to be necessary to determine the amount of actual damages at any chapter."

(3) If neither of the above is an appropriate sanction, some other issue-related sanction should be devised by the Court and counsel.

The two concrete proposals would not be sanctions within any of the specific provisions of Rule 37. They would not be orders that any facts "shall be taken as established," under (2)(A). They would not be orders refusing to allow defendants to defend designated claims, or prohibiting defendants from introducing evidence favorable to them, under (2)(B). They would not be orders striking pleadings, or staying further proceedings until the order is obeyed, or rendering a default judgment against the disobedient party, under (2)(C). Indeed, Rule 55(e) would prevent the entry of a default judgment against the Government here.

■ Of course, the Court has latitude to go beyond the specified items in Rule 37 and fashion other sanctions which would be appropriate. But the vice of the Government's proposals is that, in the context of the history of this case, they are not sanctions in any sense. Not a single issue going

to the merits of the case or the Government's jurisdictional defenses is eliminated. No facts are conclusively established. In other words, the proposed sanctions are only further attempts to defeat plaintiffs' motion and to force plaintiffs into trying their case without the crucial informant evidence, or with only the portion of the evidence which the Government has unilaterally decided it will produce.

The Government's proposals, and indeed any issue-oriented Rule 37 sanction, would require the Court to create some mechanism to try the case without plaintiffs' ever obtaining the evidence which the Court has already determined to be an essential *threshold requirement* to any progress in the fair litigation of the issues.

The appropriateness of the Court's exercise of discretion in ordering production of the eighteen informant files to plaintiffs' counsel has already been sustained. However, the Government's proposals for issue-oriented sanctions in place of enforcement of the order for the production of the files, make it necessary yet again to emphasize the essential nature of these files to the litigation of this case.

This Court has studied the eighteen informant files themselves to a substantial extent, and has exhaustively reviewed detailed summaries of these files prepared by the Government. This Court has studied the seven informant files voluntarily produced in the summer of 1976 and the two other quite insignificant informant files voluntarily produced at subsequent times. The Court has analyzed these materials as they relate to certain other documents produced by the FBI—particularly the COINTELPRO and Disruption Program documents, and, of course, as they relate to the various legal and factual issues in this case. After careful consideration, it was and is the firm conclusion of the Court that the eighteen FBI informant files contain evidence which is indispensable to plaintiffs' counsel in order for them to proceed with this action on any fair basis. It was and is the Court's further conclusion that this evidence is so basic and essential that no major

issue in the case—whether relating to injunctive relief, claims for damages, or jurisdictional defenses—can be resolved without developing a factual record with evidence from these files.

The Court hastens to state that there is no magic in any set number of files—eighteen versus nineteen or seventeen, etc. Moreover, it may be that there are certain other files among the 1300 which contain essential information, or which might in some way be more significant than the eighteen. But plaintiffs have requested what appears to be a remarkably good selection of informant files, considering their modest number, and these files *do indeed* contain evidence of vital importance to plaintiffs. Moreover, it is impossible for the Government, or the Court, to appreciate fully the significance of this evidence from plaintiffs' point of view. Plaintiffs' counsel must have the opportunity to analyze it for themselves.

At one point, in a discussion with counsel after the Court of Appeals ruling, this Court voiced the view, in "thinking out loud," that if the damage issue were somehow out of the case, the FBI discovery of the informant files would not be necessary (Minutes October 21, 1977, p. 26). Of course, this was a purely hypothetical statement, because the damage claims were not, and are not, out of the case. However, lest there be any misunderstanding about the Court's position, the Court wishes to make it clear that, upon thorough consideration, it views the informant files as relevant to both the damage *and* injunction questions in the case. This becomes more apparent as the case progresses.

■■■ As to the injunction issue, there is a very live controversy, despite the termination of the investigation of the SWP and YSA in September 1976. The Government has suggested on occasion that the claim might be moot, but this subject has not been followed up seriously; and plaintiffs clearly do not concede mootness. The announcement of the termination of the investigation came three years after the litigation had been in progress. The injunction

claim is not rendered moot unless it is demonstrated that there is no reasonable expectation that the wrong will be repeated. *United States v. W. T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 97 L.Ed. 1303 (1952).

The Government has made it clear that it would oppose any injunction in general terms against the FBI prohibiting the investigation of the SWP or YSA, and that the only possible injunction which could be entered would need to be directed against specific activities (Memorandum October 21, 1976 pp. 13–15). Under all the circumstances it is clear that a thorough development of the facts regarding methods and activities of FBI informants will need to be developed in connection with plaintiffs' claim for injunctive relief. In this regard, it is important to note that the Government has consistently urged, as justification for some or all of the FBI activities, that the SWP and YSA are affiliated with a worldwide federation known as the Fourth International; and that there is in the Fourth International a strong faction, called the Internationalist Tendency, which espouses violence. *See Socialist Workers Party v. Attorney General,* 510 F.2d 253, 254 (2d Cir. 1974). One essential aspect of the eighteen informant files is that a number of them contain evidence bearing upon the question of whether the Fourth International affiliation led to any criminal or violent actions or plans by SWP and YSA members in the United States.

As to the damage claims, it should be reiterated that plaintiffs are asserting the most serious claim of a plan by the highest officials in the FBI to destroy or cripple the SWP and the YSA and their branches throughout the country.

Plaintiffs allege that as part of, and in addition to this disruption plan, the FBI, through its informants, committed illegal acts by converting private documents, interfering with the privacy of the organizations and their members, and assuming leadership roles and thus manipulating the organizations.

Plaintiffs must be permitted to develop a full factual record about these matters in order for them to litigate fairly their damage claims against the Government, both as to the alleged overall plans to destroy and cripple, and the individual instances of alleged wrongdoing in various locations. The Government's repeated assertions that all these damage claims can be dismissed as a matter of law are totally unrealistic.

The Court notes that on June 21, 1978 the Government filed a motion to dismiss "damage claims in the Second Amended Complaint with respect to informant activity for lack of subject matter jurisdiction." The motion was filed with knowledge that it would be adjourned, and was immediately adjourned to September 18, 1978. The Government now requests that any decision to hold the Attorney General in contempt be deferred until after decision of the above motion.

The grounds urged in the new motion to dismiss could have been raised as much as two years ago. It provides no justification for delaying the enforcement of the May 31, 1977 discovery order.

It is necessary to return briefly to the "sanctions" proposed by the Government. The first proposal is to have plaintiffs establish their damages from facts in their possession, and that there would be a *prima facie* presumption that such damages were the result of informant activity, subject to the ability of the Government to prove the contrary.

After study of the issues, the Court is convinced that this proposal would leave plaintiffs in an impossible position. Without a representative sample of the detailed evidence in the informant files, and some reasonable summarization of the other informant file evidence, plaintiffs are deprived of the most important source of evidence needed by them both to develop the full nature of the wrongdoings and damages, and to rebut Government defense evidence.[8]

---

8. The problem can be illustrated by reference to the informant Redfearn. Assume, hypothetically, the trial of the YSA's claim about burglaries in Denver. The YSA knew that there had

The second proposal for sanctions by the Government asks that plaintiffs go forward with some kind of test case based on eight files voluntarily produced previously, and the four files from the eighteen which the Government is willing to produce now. This is simply a renewed effort to whittle down plaintiffs' already modest, compromise request for documents. The files which the Government is willing to produce do not constitute a fair selection. They do not cover the range of locations and activities embraced in the total number of files ordered to be produced by the Court.

The third proposal is to have further discussion about possible sanctions. In the Court's considered opinion, on the basis of long experience with this problem, the suggestion of further discussions would only result in further delay.

The present case is strikingly similar to *United States v. International Business Machines Corp.*, 60 F.R.D. 658 (S.D.N.Y.), *appeal dismissed*, 493 F.2d 112 (2d Cir. 1973), *cert. denied*, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974), where the District Court held IBM in civil contempt and imposed a fine of $150,000 per day for failure to produce allegedly privileged documents. This contempt citation was made at the urging

of the Department of Justice to the effect that issue-related sanctions would be ineffective and that full enforcement of the Court's order through a contempt citation was the only appropriate remedy.

The Government has cited a number of decisions in which issue-oriented sanctions were imposed to remedy discovery defaults by the Government. Without exception, these were cases in which the full nature of the wrongs allegedly inflicted on the plaintiffs, and of the damages allegedly resulting, were already known to the plaintiffs. The evidence which the Government declined to produce in those cases was evidence going to the issue of the Government's responsibility for the harms suffered by the plaintiffs—for example, the negligence or wrongful motive of an agent of the Government. When the Government withheld the evidence on this issue, it was possible for the courts to impose as a sanction the resolution against the Government of this discrete, well-defined question of Government responsibility. These precedents are therefore of no help to the Court in resolving the present problem. In all of these cases, there was a *workable alternative* to the contempt sanction.[9]

been a burglary at certain premises, and suspected Government involvement. Presumably under the Government's proposal, the YSA would present this claim to the Court. Then the Government could call agents from the FBI in Denver to deny any burglary. It is interesting to suppose that such testimony were to be given by the agent who signed the answers to interrogatories, and who in effect denied burglaries by Redfearn in those answers. Presumably he would make such denials at the trial. We now know that this agent falsified the answers to interrogatories and the Redfearn file showed burglaries. But if plaintiffs did *not* have the file, they would have no way of rebutting the Government agent.

**9.** *See United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (plaintiffs were widows of men killed in airplane crash; Government refused to obey order to produce accident reports; district court ordered facts as to negligence established in plaintiffs' favor); *Black v. Sheraton Corp.*, 184 U.S.App.D.C. 46, 564 F.2d 531 (1977) (action for damages from illegal FBI eavesdropping on theories of trespass, invasion of privacy, and violation of con-

stitutional rights; Government refused to produce documents from FBI file; as sanction, district court held that plaintiff had made a prima facie showing that the Government's conduct was a substantial cause of well defined damages asserted by plaintiff); *Smith v. Schlesinger*, 168 U.S.App.D.C. 204, 513 F.2d 462 (1975) (plaintiff, a former aerospace engineer, sued claiming that revocation of his security clearance was arbitrary and capricious; Government refused to comply with court order to produce plaintiff's investigative file; district court ordered Government precluded from introducing evidence on the reason for denial of the clearance); *Campbell v. Eastland*, 307 F.2d 478, 492 (5th Cir. 1962), *cert. denied*, 371 U.S. 955, 83 S.Ct. 502, 9 L.Ed.2d 502 (1963) (action for tax refund; Government refused to produce materials from criminal tax investigation file; district court ordered answer struck and judgment entered in amount of refund claimed; circuit court reversed, holding that a more limited sanction would be more just *and would be workable*: "the plaintiffs did not show that they were dependent on information from the Government to prove their loss; they sought discovery for the purpose of anticipating collat-

In the present action, there is, in the considered opinion of the Court, no workable alternative to full enforcement of the Court's order through contempt.

## Conclusion

For the foregoing reasons, plaintiffs' motion to cite the Attorney General of the United States for civil contempt of court for failure to comply with the order of the Court dated May 31, 1977 is granted to the extent that the Attorney General is given notice that he must comply with the order forthwith, and that if he does not comply by 5:00 p. m. July 7, 1978, he will automatically be in civil contempt of court thereafter until he complies with the order. To the extent that plaintiffs apply for an order directing the imprisonment of the Attorney General, that application is denied, without prejudice to the making of a renewed motion for that or other specific sanctions.

So ordered.

## APPENDIX A

*Excerpt from Minutes of May 31, 1977*

THE COURT:

The bulk of what I wish to discuss today deals with the FBI informant issue.

I have decided to direct that the FBI make available to specific attorneys for plaintiffs the files and summaries thereof of the eighteen numbered informants about which we have had discussions. Except by specific court permission, plaintiffs' counsel will confine this information strictly to themselves without revelation to their clients or to anyone else beyond the specified lawyers.

But let me summarize briefly my reasons for directing this procedure. These reasons have already been discussed to a large extent at the in camera hearing of May 19.

I start with the proposition which has been articulated many times, which is virtually conceded, that the principal activity of the FBI vis-a-vis the Socialist Workers Party and the Young Socialist Alliance was the use of informants. During the period beginning about 1960, up to the discontinuance of the program by the FBI in the fall of 1976, it appears that during this period of time, some 1300 informants were used by the FBI in its investigation of the SWP and YSA. That includes 300 persons who were apparently members of the SWP or the YSA.

The other approximately 1000 would apparently be people such as janitors or employees of banks or employees of schools or other people who were in a position to give information to the FBI, but they did not apparently literally infiltrate the membership of the SWP or the YSA.

It has been recognized for a long time in this case that the informant issue lies at the very heart of the plaintiffs' case as to the FBI. I would venture to say that although there are other Government agencies and officials sued in the case, the cause of action against the FBI is by far the most important phase of the plaintiffs' claims in this entire action.

From the very outset everyone has recognized that the disclosure of the evidence about the informant activity presents a most difficult problem. This has led the plaintiffs to approach the matter in a rather gingerly step-by-step process.

eral objections that the Government might raise"); *Bank Line v. United States,* 163 F.2d 133 (2d Cir. 1947) (action for damages arising out of maritime collision; Government refused to produce investigative reports and persisted in refusal after it was unable to obtain interlocutory review; district court precluded Government from introducing evidence as to side of channel on which collision occurred); *Kahn v. Secretary,* 53 F.R.D. 241 (D.Mass.1971) (plaintiff alleged his application for a reserve officer's commission was denied for improper reasons; Government defendants refused dis-

covery; district court ordered it established that plaintiff was denied a position on unsubstantiated grounds of security); *O'Neill v. United States,* 79 F.Supp. 827 (E.D.Pa.1948), *rev'd sub nom. Alltmont v. United States,* 177 F.2d 971 (3d Cir. 1949), *cert. denied,* 339 U.S. 967, 70 S.Ct. 999, 94 L.Ed. 1375 (1950) (admiralty action for personal injuries incurred when ship was sunk by enemy mine; Government refused to produce FBI investigative reports; district court ordered Government precluded from contesting allegations of negligence and unseaworthiness).

It has led the FBI to strongly object to the production of any information which would lead to the identification of informants who were not otherwise already identified. It has led to extremely cumbersome discovery procedures which have involved the FBI and the Department of Justice in great labor and which have consumed vastly greater amounts of time than would ever be conceived of in the discovery in an ordinary case.

Three basic things have been carried out in connection with discovery on the FBI informant issue. Some time ago the plaintiffs addressed interrogatories to the Government asking for certain specific items of information about the informants. There are some 1300 sets of interrogatory answers supplied, which were gotten together by local offices of the FBI and reviewed to some extent by the Washington office of the FBI and the Department of Justice.

It is safe to say that for a variety of reasons these answers to interrogatories, although undoubtedly requiring great effort of preparation, are totally inadequate to provide the kind of evidence that any competent plaintiff's attorney would wish to have for the pursuit of this case.

The second stage occurred last summer when plaintiffs asked for the production of the FBI files relating to seven informants whose identities plaintiffs had learned. After some initial opposition, the Government consented or did not oppose the production of these files, for the reason that the identities of these persons were already known to the plaintiffs, and therefore, the confidentiality simply did not exist. These files were produced to the plaintiffs last summer.

The next stage occurred with the application by the plaintiffs for the production of nineteen additional files relating to informants listed by number in the answers to interrogatories, but whose identities have not been disclosed. The plaintiffs made a selection of these 19 from the total of about 1300, believing that they would provide a sample somewhat broader and somewhat more representative than the seven informants whose files they obtained last summer. The application for the production of these nineteen additional files was made last August. It was opposed by the Government. An official of the FBI submitted an affidavit explaining the claim of privilege. This affidavit was dated October 4, 1976. This official testified in early November 1976.

The trouble with the presentation at that time was that it all dealt with the general proposition that the disclosure of informants would subject such people to retaliation by the SWP and the YSA and would create a severe psychological problem in the relationship between the FBI and informants in other investigation programs. But no one had reviewed the files in question. Consequently I felt that we were engaged in a somewhat theoretical exercise which did not permit any sensible ruling pro or con on the claim of privilege.

This led me to at first request an opportunity for an in camera review of the nineteen files. This provided me with some information, but the nineteen files were sufficiently voluminous that I realized it would be impossible for me personally or for my law clerk personally or both of us personally to really make any kind of intelligent review of the files.

Consequently, in late November 1976 I asked the FBI and the Department of Justice to provide summaries of the nineteen files answering certain listed questions. This process took far longer than I envisioned, and undoubtedly took a great deal of work, but the summaries were finished in early April.

As I understand it, the Government's objection to one of these nineteen files has been withdrawn, leaving eighteen in contest. The summaries of these files were gotten together in a most painstaking manner and, as far as I could tell, were done with scrupulous accuracy and completeness. I certainly have not checked them out in any complete sense, but on a small spot-check basis they certainly appear complete and on their face they represent clearly a

tremendous effort at completeness and accuracy.

At a hearing of April 14, 1977, I summarized the type of information which was contained in the files. I did this on the public record without disclosing any particulars which would lead to the identification of the specific informants. As the record shows, I did not attempt to make any ruling pro or con on the claim of privilege as to the informant files, these eighteen files in question.

I went ahead at that time and raised with the parties the basic and very important problem as to the handling of the overall informant evidence question in this case. The problem in this case regarding discovery and evidence is not answered by eighteen files or any small number of files. The evidence and discovery problem in this case can only be resolved when we come to grips with the handling of the information about FBI informants on a comprehensive basis. Ultimately, that involves handling some 1300 informant files in a reasonable way.

On April 14, I made some proposals about having the Government make further extracts from the informant files which might provide evidence for the case with a minimum of identification of specific informants.

This was discussed without ruling finally on the question of the eighteen files in contest.

At the hearing of May 5, Mr. Boudin on behalf of the plaintiffs argued that, for a variety of reasons, no amount of Government summarization of the raw data would suffice. He also made application for the disclosure of the identities of all 1300 informants and indicated that in his view the files themselves would be an impractical means of handling discovery on all 1300 informants because of the immense volume of the files and the need to conduct independent inquiries, and take depositions.

At either the April 14 of the May 5 hearing I broached the suggestion that perhaps a way to get through our many impasses on this informant issue was to have plaintiffs' counsel be able to review informant files on restricted basis without any disclosure to plaintiffs or to the public. This led to our meeting in camera on May 19. Mr. Boudin at first took the position that he would not agree to review files without being able to discuss the information with a representative of his clients.

Since the May 19 meeting I have had letters from Mr. Boudin dated May 23 and from Mr. Brandt dated May 24 announcing their final positions as to the idea of the restricted review of the FBI informant files by plaintiffs' counsel.

The Government strongly objects to production of any informant files or summaries to plaintiffs' attorneys. Mr. Boudin on behalf of the plaintiffs still takes exception to a restriction which prevents his sharing discovery information with his clients. However, Mr. Boudin's final position is that if the Court orders that the inspection of the FBI informant files be limited to plaintiffs' counsel only, without any revelation of the contents to his clients or representative thereof, he would go forward with such an inspection, and gives full assurance that the restrictions imposed by the court would be completely honored.

I propose to proceed on that basis, that is, directing the production of the eighteen files in question and the summaries thereof to plaintiffs' counsel for their use and their use only, subject to any further order of the Court that might be appropriate at a later time.

My basic reasons for doing this are the following. In the first place, there is a sharp distinction between production of these materials to plaintiffs' counsel on a restricted basis, and the public disclosure of the materials by way of ordinary discovery. This distinction is highly relevant to the objections of the FBI to production of the informant files. The two basic objections are that such disclosure will lead to the public identification of the informants and a danger of retaliation against them by the plaintiff organization; and that public disclosure of the files, and the identification of

the informants, will tend to cause informants in other Government investigations to fear loss of confidentiality, thus jeopardizing these other informant programs.

As to the risk of retaliation against the informants, there is no contention, of course, that plaintiffs' attorneys will engage in such retaliation, I do not mean to imply that plaintiffs themselves would do so. But it is clear that production to plaintiffs' lawyers, in and of itself, simply will not occasion any difficulty regarding retaliation.

With respect to the danger to other Government informant programs, the problem boils down to the theory that if other informants or potential informants learn that the SWP and YSA informants have been identified and subjected to publicity, possible harassment, etc., then the informants and potential informants in the other programs might fear the same would happen to them. However, as already stated, a restricted production of informant files to plaintiffs' counsel simply does not involve the public identification and exposure of the SWP and YSA informants. There can be no headlines in the press about revelation of names of informants or anything of this kind. Even the fact of the procedure being used—that is, production to plaintiffs' attorneys—I intend to have treated with the maximum of confidentiality.

Thus it is my view that the restricted production of informant files to plaintiffs' counsel involves no interference—or a negligible interference—with legitimate law enforcement and other interests sought to be protected by the FBI and other Government agencies.

The Government contends that there is no sufficient showing of the need for production of the informant files, even on a restricted basis, to plaintiffs' attorneys. I reject this contention.

The files of the FBI regarding the 1300 informants used against the SWP and YSA undoubtedly constitute the most important body of evidence in this case. They record in immense detail the activities of the informants, the instructions of the FBI, evaluations by the FBI, and so forth.

The extensive infiltration of the SWP and YSA by the FBI's member-informants, and the gathering of information from various kinds of non-member informants, raise serious questions under the federal constitution, as well as other federal and state laws and legal doctrines. There is a serious question as to whether the bulk of these FBI activities had any valid law enforcement purpose. Indeed, in the fall of 1976 the Attorney General ordered the FBI investigation of the SWP and YSA to cease.

The Government contends that discovery of the informant files is unnecessary because the voluntary cessation of the informant program precludes the need for injunctive relief, and because there are various legal barriers to any recovery of damages, particularly under the Federal Tort Claims Act. On the latter point, I have previously denied a motion to dismiss the claims under the Federal Tort Claims Act, on the ground that the legal issues could not be properly determined without the development of a factual record. I adhere to that ruling. There are indications from the few files thus far examined that there may be a variety of tortious acts which were committed by the FBI, including trespass and conversion of property. The latter refers to removal of private documents for production to the FBI. The FBI and certain informants may have engaged in activities designed to intentionally destroy certain chapters of the SWP and YSA. The evidence about the FBI informants may reveal other activities giving rise to valid claims for damages.

I am not attempting to indicate any view on the ultimate merits of any claim. I am only stating that there are questions which are sufficiently serious to merit thorough exploration of the evidence.

I have reached certain conclusions about the discovery procedure to be used. To a great extent these conclusions are based upon my analysis of the summaries of the 19 informants' files now requested by plaintiffs, plus information about the 7 files vol-

untarily produced last summer. I conclude that there is no legitimate reason for the wholesale public disclosure, in the manner of normal discovery, with respect to all the FBI informant files or the identities of all the informants. I am convinced that, with careful analysis and preparation, much of the necessary information about the informant activities can be presented at the trial of this action without identifying specific informants. I discussed this to some extent at the hearing of April 14. However, this preparation and analysis cannot possibly be done without the participation of plaintiffs' attorneys. Neither the Government nor the Court should be relied upon to develop plaintiffs' case.

It may well be that the files of certain selected informants, and the identities of these informants, should be publicly disclosed in normal discovery proceedings, and that the evidence about these specific informants should be presented at the trial. There are a variety of reasons why this may be necessary and appropriate. However, the question of whether, and to what extent, this should be done, cannot be decided intelligently without the participation of plaintiffs' attorneys.

Plaintiffs' counsel must have access to the detailed facts about the use of informants. They have to date been denied access to any such detailed information, except with respect to the seven files produced last summer relating to people whose identity in some way had already been disclosed to them. But these seven files are simply inadequate by a very long way, from providing plaintiffs' counsel with proper information about the activities of the 300 member informants as a whole, to say nothing of the other 1000 or so informants who were not members.

The procedure of summarizing, having the FBI or the Department of Justice summarize files, constitutes a deprivation of the plaintiffs' lawyers from anything resembling their normal right to develop their own evidence.

If we go along on some basis where we are relying on summarization by the FBI and the Department of Justice, we are multiplying the burden on the Government enormously and multiplying the time required for any development of the issues by a tremendous degree. In other words, a new process simply has to be instituted. Both the burden and the opportunity of viewing the basic evidence should be and must be in the hands of plaintiffs' lawyers. That is the only way the litigation can proceed from here on out in any sensible fashion.

Let me outline the procedure I have in mind specifically. I want to say at this point that I am starting with the eighteen files, but I want it clearly understood that I envision that the production will not stop with the eighteen files and undoubtedly will go beyond these files. The information contained in the eighteen files is sufficiently valuable and of sufficient importance to indicate that there is valuable and important information, or there should be valuable and important information in various other of the remaining 300-odd files of member informants, and indeed another thousand files for nonmember informants. I intend at the present time to start with the eighteen, and I think this will permit an intelligent discussion by all concerned as to the issue of whether any of those specific files should be revealed in public discovery, whether there should be depositions taken of the informants, and how to handle in some intelligent, sensible way the information contained in the large number of other files.

I come now to the question of the precise persons who will have access to the files. I have no question about Mr. Boudin and Mr. Jordan, and I am well acquainted with them through the history of this case, and I state flatly that I have no doubt whatever that they will faithfully obey the orders of this Court with respect to confidentiality.

Mr. Boudin has written me in his letter of May 23 expressing his difficulty in having the production limited to two lawyers only, and he has mentioned his need for having the other two lawyers on the case work also. I assume that you are referring to Ms. Pike and Ms. Winter?

MR. BOUDIN: Precisely.

THE COURT: He has stated that Ms. Winter, however, is a member of the Socialist Workers Party. I will come to that in just a minute.

Ms. Pike, I take it you are not a member of any of the plaintiff organization?

MS. PIKE: That is correct.

MR. BOUDIN: May I just interrupt. We are, four of us, members of the bar. Your Honor does know me and Mr. Jordan. Your Honor has had both other counsel before you on a number of sessions. They are both members of the bar of the District of Columbia, and they have been admitted for purposes of this case, and I vouch for their reliability. I cannot have a distinction made among counsel who are associated with me in a case and have the Court place a certain value of reliability upon one counsel as against the other. I am the principal counsel, and I am responsible for this case, and I really think that I may have been unwise in indicating a reference to membership by one of my co-counsel in the Socialist Workers Party. So far as we are here, we are here only as lawyers.

THE COURT: I have no problem as far as Ms. Pike. I think that I have observed Ms. Winter, she has appeared before me, and also in fact I think I know her a little better than Ms. Pike. From what I can see, I have the greatest respect. I don't think this is really a matter of personal respect anyway. I don't think that is anything that should enter into it, except if there was a lawyer who I did not have confidence in, I would not engage in this activity.

I must tell you that our problem here is largely with respect to possible publicity, and I am concerned with several things on the question of publicity and just let me mention them.

As to the FBI's fear for other informant programs, we are dealing, as I said before, in a somewhat speculative area. We are dealing with the subject of risk. What risk is run over what length of time by publicity about disclosure by informants? What amount of accuracy or inaccuracy or exag-

geration can occur in the press? We all know that that is inherent with the best will in the world. There are things that get exaggerated or misunderstood, etc. Then for the people who will read this publicity, if it ever occurs, and who might be in the position of the informant or potential informant that the FBI is talking about, the effect of publicity on them, again it is speculative but the risk, it seems to me, is there, and I want to be concerned about it, that you might have people who are sufficiently frightened for one reason or another that the scales are tipped by publicity. That is what I am concerned about.

Now, as to the possibility of leakage resulting from the procedure I contemplate, I really am not concerned about the actual disclosure of informants identities. I just think that whether it is Ms. Winter or any of you or any other group of attorneys, if the order is that you are not to disclose information or names to the press, that just won't be done period.

MR. BOUDIN: Right.

THE COURT: Let us come to another consideration. With respect to this procedure, the fact that the materials are being disclosed to you as counsel, it is desirable that we go about this procedure in the greatest confidence obtainable. I am going to enter as much of an order as I can to insure that. But I am not under any illusion that there is no chance that the fact of the procedure may become known to the press or be inferred by the press.

And, I am willing to run that risk, frankly, and I think it is very little risk compared with the value of this case of getting the job done. Certainly, under the *Roviaro* case I think the Court has discretion to run some minimal risk. It is much less of a problem if the press picks up the fact that counsel were given the identities on a confidential basis than if the press could print names of informants.

But I want to consider whether there is some problem if you have a member of the SWP as an attorney.

MR. BOUDIN: Let me address myself to that, because that is where your Honor is wrong. I thought about it, obviously, I thought about it before I wrote my letter. What your Honor is going to do here is to direct in camera that counsel—just called counsel—can have access to these records. We are not going to publicize or give notice to anyone even that counsel has been given this, nor I assume will the Government give notice even that counsel—

THE COURT: You understand that, Mr. Stapleton?

MR. STAPLETON: Yes.

MR. BOUDIN: The question of which counsel associated with me can look at documents is a question completely within my office. It is not a matter of publicity. We don't announce who is going to look at it. It is simply that I as counsel for the plaintiffs will decide which of the lawyers in my office—it happens to be one of these four—will be doing the work on the matter.

You mentioned a dual aspect. There is nothing dual about this, your Honor. Everybody has his own political affiliations, or almost everybody has, of one kind or another. And I don't regard that as creating a dual loyalty. In this case, no matter what I may be elsewhere, I am only counsel for the plaintiffs and a member of the bar. My own political views and associations are completely irrelevant, and there is no dual responsibility.

THE COURT: In other words, you would vouch for Ms. Winter that insofar as the requirements of this case, insofar as obeying the orders of the Court, you would vouch for her that her prime loyalty in what we are talking about is to obey the Court's orders.

MR. BOUDIN: The only loyalty in this case is to Court and the case and to your Honor. There is no loyalty on her part to any organization as she acts as counsel here, any more than there is any loyalty on the part of other attorneys here who may have other associations. And I suspect that I have probably been charged with many more associations, mostly untrue, in the course of my lifetime. When I act as counsel, I act only as counsel and an officer of the Court. And I vouch that that will occur here.

MR. BRANDT: Your Honor, if I might just add—

THE COURT: Let me finish, I think you understand my problem, Ms. Winter. What I would like to know from you, and I am sure will be utterly frank with me, is there any problem at all, as far as you are concerned, with maintaining 100 percent all directions about confidentiality that I impose here? Is there any problem as far as you are concerned in maintaining that, obeying that, even though you are a member of the Socialist Workers Party?

MS. WINTER: Your Honor, I have no problem with that whatsoever.

MR. BRANDT: Your Honor, may I just voice the Government's objection to the addition of the attorneys, in addition to our objection to the proceeding.

THE COURT: I thought you had voiced your objection in a letter.

MR. BRANDT: I just wanted to make it clear, being that we are discussing this particular matter of additional attorneys being given the identity of the FBI's eighteen informants. I just wanted the objection clearly stated for the record.

THE COURT: I think I understand you have objected entirely to this procedure, and I will assume that the record will reflect that. I will direct that the materials that I have referred to be made available to Mr. Boudin, Mr. Jordan, Ms. Pike and Ms. Winter. The order specifically covers now the eighteen files in question and the summaries thereof. Further applications may be made for further relief. I don't think we have to cover that now. As far as any files beyond the eighteen. I would want that subject to a further application.

I am specifically directing, and I will enter no further order, that the information contained in these files and in the summaries is to be given to absolutely no one beyond the four lawyers unless specifically permitted by the Court. The importance of

this procedure is obviously known to the four lawyers and it is known to Mr. Stapleton, who I think is the chief liaison with the lawyers for the plaintiff organizations. I specifically invited him today to be here, and I specifically authorized Mr. Boudin to keep him fully informed of our proceedings last time. I am directing that neither Mr. Stapleton nor the plaintiffs' lawyers make any statement whatever to the press about the procedure which we are using.

## APPENDIX B

*Excerpt from Minutes of June 22, 1977*

THE COURT:

One of the things that is displayed in the 19 files which I have reviewed in camera and I have had summarized, one of the things which comes forth there is material dealing with the so-called International Tendency, I think is the word for it. We all recall that at the time of the preliminary injunction motion in late 1974 the government claimed as a justification for infiltrating the upcoming convention that there was reason to suspect violent activity or planning of violent activity on the part of the Socialist Workers Party and to keep surveillance about such matters, for the following reason:

The claim was that the Fourth International had passed a resolution in 1969 at its world congress approving terrorism or violent revolution in Latin America, that the majority of the Fourth International had approved this motion. It was recognized that the United States party, that is, the Socialist Workers Party, had voted against that resolution and argued against it, but the government went on to contend that there were elements even within the Socialist Workers Party which espoused a revolution or favored violence or terrorism in Latin America.

This gets rather complicated because of procedural problems in the Socialist Workers Party and the Fourth International, but the idea was that a minority within the Socialist Workers Party appeared to favor the pro violence resolution of the Fourth International.

If I recall correctly, the Court of Appeals relied on this to a substantial extent, relied on this argument of the government in reversing the injunction which I had entered. It was quite apparent that this was an area which required factual exploration in connection with the trial of this action.

This is not an area which is easy to deal with. It is not an area which is easy to get the relevant facts concerning. But the informant files are an important source of facts about that matter. And I discussed that in a general way at the April hearing when I was summarizing in a general way what was shown in the informant files.

I simply want to expand on that now by saying that certain of the 19 informant files contain reporting about meetings of this minority group within the Socialist Workers Party, which is called the Internationalist Tendency, I believe, that was organized by people who thought they favored the pro violence revolution. These informant files, therefore, in my view, contain important information on this issue which the Court of Appeals felt was important and which is important; that is, the extent of the influence of the pro violence group in the United States party, if any; what was discussed, what was done, what did the FBI know about the extent of pro violence, were there any plans of violent activity affecting the United States or any other country by this group or any other group in the Socialist Workers Party, or was it simply a discussion of other matters?

I say the latter, because from my review of these files it appears that although there was this thing called the Internationalist Tendency and although there was the resolution by the Fourth International we talk about, I have read the material about the observations of discussion within the Internationalist Tendency; I have yet to read anything in these informant files indicating any planning of actual violence or discussions of actual violence among Socialist Workers groups in the United States.

I'm not saying that to make a finding of fact; there may be other information. All

I am trying to indicate is that these without question constitute an important source of information about the extent of any discussions of violence or a lack of discussions of violence by this particular segment of the SWP. It contains an important source of information as to what the FBI knew about the actual facts about this Internationlist Tendency.

I want to add this as one important reason why these files are an absolutely indispensable source of evidence in this case and at the very least in my continuing view they should be furnished to plaintiff's counsel for this and other reasons. That terminates our conference.